# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING PERFORMANCE UNDER SETTLEMENT AGREEMENT, (II) APPROVING SETTLEMENT AGREEMENT, AND (III) GRANTING RELATED RELIEF

> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 11, 2018 AT 2:00 P.M. (CENTRAL TIME) IN COURTROOM 404, 4th FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion.

## Introduction

1.    Cobalt has successfully secured a global settlement of issues between Cobalt and Sonangol, the state oil and gas company of the Republic of Angola.[2] The proposed settlement

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, LP (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]    In this motion, "Sonangol" means parent company Sociedade Nacional de Combustíveis de Angola—Empresa Pública as well as Sonangol Pesquisa e Produção, S.A.

delivers a $500 million settlement payment to Cobalt, resolves all outstanding disputes between Cobalt and Sonangol, and secures Cobalt's consensual exit from Angola by transitioning Cobalt's Angola assets to Sonangol.

2.      Cobalt acquired contractual rights to its Angola assets in 2007.  In 2015, following a strategic review of its portfolio, Cobalt determined to market its Angola assets.  In August 2015, Cobalt's non-Debtor subsidiary that holds the Angola assets entered into an agreement to sell those assets to Sonangol for $1.75 billion.  Through the proposed Angola sale, Cobalt hoped to de-risk its balance sheet and focus its business efforts on its core Gulf of Mexico assets.  Sonangol paid an initial deposit of $250 million but failed to obtain Angolan government approvals required to close the deal, and, as a result, the purchase and sale agreement automatically terminated in August 2016.  Cobalt (through non-Debtor subsidiaries) subsequently commenced arbitration regarding the transaction and Sonangol's breach of contract.  In addition, Cobalt commenced a parallel arbitration against Sonangol for non-payment of past costs owed to Cobalt for operations related to the Angola assets.

3.      Cobalt engaged with Sonangol regarding a potential resolution of the parties' disputes for many months of active negotiations.  Following recent political changes in Angola (including the election of the first new president of the country in over 30 years) and a resulting leadership change at Sonangol, these settlement discussions took on a renewed focus and culminated, on December 19, 2017, with Cobalt and Sonangol successfully reaching agreement on a global settlement (subject to Court approval).

4.      Key terms of the settlement include:

- $500 million payment by Sonangol to Cobalt, payable in two installments ($150 million paid by February 23, 2018, and the balance of $350 million paid by July 1, 2018);

- the resolution of Cobalt's two International Chamber of Commerce ("ICC") arbitrations seated in the United Kingdom and Switzerland (and avoidance or mitigation of potentially substantial costs of continued arbitration);

- a full release of all disputes, debts, and obligations between the parties (including Sonangol's release of any claim to the $250 million deposit paid in connection with the contemplated sale); and

- the transition of ownership of Cobalt's Angola assets to Sonangol.

5.       The benefits of this favorable settlement, including $500 million in incremental cash to monetize assets otherwise mired in arbitration and the settlement of all obligations and debts between the parties, inure to the benefit of the Debtors and their stakeholders.  The Debtors respectfully submit that the proposed settlement is well within the range of reasonableness, particularly when factoring in the time, expense, and risk in continuing to pursue the arbitrations and in enforcing any ultimate award.  The settlement is an appropriate use of estate assets and a sound exercise of the Debtors' business judgment.  Accordingly, the settlement should be approved and the Debtors should be authorized to cause their applicable subsidiaries to consummate the settlement.

**Relief Requested**

6.       By this motion, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing the Debtors to cause certain wholly-owned non-Debtor subsidiaries to effectuate and perform under that certain Settlement Agreement, dated December 19, 2017 (the "Settlement Agreement"), by and among Cobalt entities Cobalt International Energy Angola Ltd ("Cobalt Angola"), CIE Angola Block 9 Ltd. ("Block 9 Co."), CIE Angola Block 20 Ltd ("Block 20 Co."), CIE Angola Block 21 Ltd ("Block 21 Co." and, together with Cobalt Angola, Block 9 Co., and Block 20 Co., the "Angolan Subsidiaries"), and Sonangol entities Sociedade Nacional de Combustíveis de Angola—Empresa Pública, and Sonangol Pesquisa e Produção, S.A., (b) approving the Settlement Agreement, and (c) granting related relief.

**Jurisdiction and Venue**

7.     The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The bases for the relief requested herein are sections 105(a) and 363(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rule 9019, and rule 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**Background**

9.     The Debtors are a publicly held offshore oil exploration and production company with headquarters in Houston, Texas and operations primarily located off the coast of the United States in the deepwater of the Gulf of Mexico and offshore Angola and Gabon in West Africa. The Debtors have four named discoveries in the Gulf of Mexico, which include North Platte, Shenandoah, Anchor, and Heidelberg.  Heidelberg began initial production in January of 2016 while North Platte, Shenandoah, and Anchor have been fully appraised and are now in development.  Additionally, the Debtors have made seven discoveries in offshore Angola and maintain a non-operated interest in offshore Gabon, where the Debtors have one discovery.

4

10. On December 14, 2017 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David D. Powell, Chief Financial Officer of Cobalt International Energy, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously with this motion.[3]

11. The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 33]. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## I.  Cobalt's Angola Assets and Proposed Sale.

12. Cobalt first acquired contractual rights to three blocks (Blocks 9, 20, and 21) in assets in the Kwanza basin off the coast of Angola in 2007. Subsequently, Cobalt, through non-Debtor subsidiaries and alongside additional members of the contractor group for each block, entered into licensing agreements with Sonangol that governed the exploration and production of oil and gas from the blocks. Cobalt continues to hold an ownership interest in Blocks 20 and 21, representing approximately 2.4 million gross acres.[4] Cobalt is the operator of, and holds a 40-percent working interest in, these blocks.

13. On February 13, 2009, Whitton Petroleum Services Limited and Cobalt International Energy L.P. entered into that certain Overriding Royalty Agreement Relating to

---

[3]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

[4]  Cobalt relinquished its interest in Block 9 in 2016.

Blocks Located Offshore Angola. Pursuant to this agreement, Cobalt International Energy L.P. shall pay Whitton Petroleum Services Limited ("Whitton"):  (a) a 2.5-percent overriding royalty payment in respect of crude oil production from Blocks 9, 20, and 21 Offshore Angola, as applicable; and (b) a 2.5-percent overriding royalty payment in respect of crude oil and natural gas production from any other oil and gas block located in Angola.  Under the royalty agreement, Whitton may have the right to receive the value of its rights and obligations upon a sale or assignment of the Angola assets, based on a determination of fair market value.

14.    Following extensive negotiations, On August 22, 2015, Cobalt entered into a Purchase and Sale Agreement (the "Angola PSA") to sell the entire issued share capital of two indirect subsidiaries Block 20 Co. and Block 21 Co. (which hold Cobalt's Angola assets) to Sonangol for $1.75 billion (as well as the reimbursement of past costs related to the assets). Pursuant to the Angola PSA, Sonangol made a $250 million initial payment to Cobalt.  Because the Angolan government approvals required to consummate the sale were not received within one year from the execution date, the conditions precedent under the Angola PSA were not met, and the Angola PSA terminated on August 22, 2016.  Under the Angola PSA, that termination obliged the parties to restitute any obligations executed by them in order to put them in their original positions as if no agreement had been entered into.

15.    The failure to monetize the Angola assets left Cobalt unable to fully develop its Gulf of Mexico assets to "First Oil" production.  The failed sale, along with the continuation of dramatically low commodity prices and general market uncertainty hurt Cobalt's ability to both sustain its funded debt burdens and to commit the capital necessary for exploration, development, and production.

16.     Following the termination of the Angola PSA, Cobalt made several attempts to resolve its disputes with Sonangol.  Cobalt executives made multiple international trips to meet with Sonangol representatives, but these meetings did not yield favorable results.  In addition, the parties met in person in London, along with outside counsel, in an attempt to resolve these matters.  Again, the parties were unable to resolve their disputes, and Cobalt pursued legal action while attempting to continue a settlement dialogue.

II.     **Arbitration.**

17.     On March 8, 2017, Cobalt submitted a Notice of Dispute to Sonangol pursuant to the Angola PSA, and filed a Request for Arbitration ("RFA") with the ICC against Sonangol for breach of the Angola SPA.  In this arbitration proceeding (the "PSA Action"), currently pending in the United Kingdom, Cobalt alleges that Sonangol breached the PSA by (a) not employing its best endeavors to obtain the required government approvals, and (b) failing to put Cobalt in the same position it would have been in if no agreement had been entered into.  Cobalt has requested an award against Sonangol in excess of $2 billion.  The arbitral tribunal has been constituted, and the parties have agreed upon the Terms of Reference.  The final hearing is currently scheduled for October 2019.

18.     Cobalt also filed a separate RFA with the ICC against Sonangol seeking recovery of over $160 million, plus interest, in unpaid cash calls that Sonangol owed to Cobalt as Operator under a joint operating agreement in relation to Block 21 and Block 9 (the "JOA Action").  Here, too, the arbitral tribunal has been constituted, and the parties have agreed upon the Terms of Reference.  The final hearing is currently scheduled for December 2018.

19.     Under the Settlement Agreement, both arbitration actions will be terminated.  More specifically, as described in detail below, the JOA Action will be terminated after Cobalt receives Sonangol's first $150 million settlement payment, and the timetable for the PSA Action will be

extended by four months.  Upon Cobalt's receipt of the $350 million balance of Sonangol's settlement payment, the PSA Action will also be terminated.

## III.  **Angolan Political Changes.**

20.     While pursuing their claims through arbitration in the PSA Action and the JOA Action, Cobalt and its Angolan Subsidiaries continued to try to work with Sonangol to resolve their disagreements.  In recent months, the political landscape in Angola has changed significantly (as has the leadership of Sonangol).

21.     More specifically, former President of the Republic of Angola Jose Eduardo dos Santos did not run for reelection in 2017.  Mr. dos Santos had served as President since 1979, and he and his family have had substantial influence on the country and its economy.  For instance, his daughter Isabel dos Santos was appointed chairwoman of the board of directors of Sonangol in June 2016, in addition to holding other positions and investments with Sonangol.  Under Ms. dos Santos's direction, Cobalt and Sonangol discussed potential settlement structures including, among other things, extensions of the concessions governing the Angola assets.  These settlement discussions were unsuccessful.  Sonangol would not agree to any extension of the concessions governing the Angola assets, which limited Cobalt's ability to effectively market the assets for sale to any third party.  (The same continues to be true today.)

22.     In August 2017, President Joao Lourenço was elected to succeed Mr. dos Santos.  Previously, Mr. Lourenço had served as Minister of Defense and Vice President of ruling political party MPLA (the Popular Movement for the Liberation of Angola).  Since taking office, President Lourenco commenced a restructuring of Sonangol, appointing a new CEO and a new board of directors.  In particular, Mr. Lourenco replaced Ms. dos Santos with Mr. Carlos Saturnino, a former Sonangol executive who had also briefly served as secretary of state for petroleum.

23.     Cobalt recognized that new leadership offered an improved opportunity to achieve a consensual resolution of its disputes with Sonangol.  Recently, the parties have worked together to break the deadlock that had developed under the prior regime.  At Sonangol's invitation, Cobalt sent members of its senior management team to Angola multiple times to engage, yet again, in in-person discussions with Mr. Saturnino and other members of Sonangol management regarding a potential resolution of all disputes.  During the week of December 18, 2017, the parties (including key members of Cobalt's management team) met in Angola to discuss the terms of a possible settlement of the PSA Action and JOA Action.  These discussions bore fruit in the form of the proposed Settlement Agreement.

**IV.     Proposed Settlement.**

24.     The proposed compromise contemplated by the Settlement Agreement represents the culmination of months of litigation and settlement discussions and offers a successful resolution of Cobalt's claims against Sonangol and those of Sonangol against Cobalt, whenever arising, and a favorable disposition of Cobalt's assets in Angola and should be approved.

25.     The Settlement Agreement is attached hereto as **Exhibit 1** to the Order.  In particular, the key provisions of the Settlement Agreement include the following[5]:

- Sonangol and Cobalt resolve all disputes and compromise, settle, and release all debts and obligations to each other and their affiliates (including any claim by Sonangol related to the $250 million deposit paid in connection with the original contemplated sale).  As such, the Company will retain the $250 million deposit previously paid by Sonangol, and Sonangol will no longer owe Cobalt the approximately $180 million joint interest receivable at issue in the JOA Action.

- Cobalt and Sonangol will transition Cobalt's interests in its Angola assets (i.e., Block 20 and Block 21) to Sonangol.

---

[5]     The following description is qualified by reference to the Settlement Agreement attached hereto as **Exhibit 1** to the Order.  In the event of any discrepancy between the terms summarized below and the Settlement Agreement, the Settlement Agreement shall control in all respects.

- Sonangol will pay to Cobalt **$500 million** in two installments:

  - **First**, upon approval by this Court and no later than February 23, 2018, Sonangol will pay **$150 million**.  Failure to make the $150 million payment will immediately and automatically terminate the Settlement Agreement.

  - **Second**, after February 23, 2018, but no later than July 1, 2018, Sonangol will pay **$350 million**.

- Upon Cobalt's receipt of the first installment payment, Cobalt and Sonangol will notify the ICC arbitral tribunal in the JOA Action that they have agreed to terminate the JOA Action.  Termination of the JOA Action will be without any order as to costs and with prejudice to all claims, costs, and damages asserted by the parties in the JOA Action.

- In addition, also upon Cobalt's receipt of the first installment payment, Cobalt and Sonangol shall notify the ICC arbitral tribunal in the PSA Action that they have agreed to extend the PSA Action's procedural timetable by four months.

- Upon Cobalt's receipt of the second instalment payment, Cobalt and Sonangol will notify the ICC arbitral tribunal in the PSA Action that they have agreed to terminate the PSA Action.  Termination of the PSA Action will be without any order as to costs and with prejudice to all claims, costs, and damages asserted by the parties in the PSA Action.

26.     The benefit of the settlement and compromise contemplated by the Settlement Agreement—obtained through significant effort in protracted, multiple-round negotiations—inures to the Debtors, their estates, and all of their stakeholders.  The settlement reflects a favorable outcome for Cobalt and maximizes the value of these assets for all stakeholders, particularly when factoring in length of time, expense, and uncertainty of a favorable outcome in continuing to pursue the arbitration.  Accordingly, pursuing the settlement is a sound exercise of the Debtors' business judgment and in the best interest of the Debtors' estates.  The Debtors respectfully request that the Settlement Agreement be approved and the Court authorize the Debtors to cause the Angolan Subsidiaries to effectuate the settlement contemplated by the Settlement Agreement and undertake any further actions necessary to perform thereunder.

**Basis for Relief**

A.     **Consummating the Settlement Agreement Is a Sound Exercise of the Debtors' Business Judgment.**

27.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Filene's Basement, LLC*, No. 11-13511 (KJC) (Bankr. D. Del. Apr. 29, 2014) (stating that, under the business judgment standard, once the debtor presents "a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct").

28.     The Debtors respectfully submit that the Settlement Agreement represents a fair and reasonable compromise that is in the best interest of the Debtors' estates. This settlement monetizes assets that were previously mired in litigation and provides a significant cash infusion that will benefit the Debtors' estates. This capital can be a critical resource for the Debtors as they manage their operations during these chapter 11 proceedings and continue the marketing process while also formulating a comprehensive plan of reorganization.

29.     In addition, the Settlement Agreement was the result of extensive negotiations among the parties, which, if approved by the Court, will allow the parties to avoid costly, time-consuming, and distracting arbitration.  This Settlement Agreement resolves all pending disputes with Sonangol, enabling the Debtors to focus the efforts of their key management team and other resources on their core business and these chapter 11 cases.  Finally, the settlement allows the Debtors to realize immediate and substantial returns on account of claims that could have taken years to liquidate (if ever liquidated) and then collect an arbitral award from a public authority in a foreign country.  Accordingly, the Debtors respectfully request that the Court enter the Order and authorize the Debtors to cause the Angolan Subsidiaries to proceed with the Settlement as such action is a reasonable exercise of the Debtors' business judgment and in the best interest of their bankruptcy estates.

**B.     The Settlement Agreement Satisfies the Standards of Bankruptcy Rule 9019 and Should Be Approved.[6]**

30.     Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

31.     "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);  *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("[s]ettlements are favored [in bankruptcy]"); *In re Key3Media Grp., Inc.*, 2006 WL 2842462, at

---

[6]     The Debtors are not party to the Settlement Agreement.  Nonetheless, the standards of Bankruptcy Rule 9019 may apply to this Settlement Agreement because the Settlement Agreement includes mutual releases that extend to affiliates of the parties (including, in Cobalt's case, the Debtors).  Out of an abundance of caution and for the avoidance of doubt, the Debtors will show that the Settlement Agreement satisfies Bankruptcy Rule 9019 and respectfully request that the Court approve this settlement.

*3 (D. Del. Oct. 2, 2006) (same); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same). Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

32.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

33.     In *Jackson Brewing*, the United States Court of Appeals for the Fifth Circuit set forth a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors the Court must consider are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise. *See Age Ref. Inc.*, 801 F.3d at 540 (internal citations omitted).

34.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the

13

settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

35.     Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Instead, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).[7]

36.     Based on the foregoing considerations, the Debtors respectfully submit that the Settlement Agreement represents a fair and reasonable compromise that is in the best interest of the Debtors' estates.  The Debtors have determined in their reasonable business judgment that the benefits of the settlement outweigh their costs after considering the probability of success in litigating the claim, the complexity and likely duration of litigation and related expenses and inconvenience, and all other factors bearing on the wisdom of the compromise, including the interests of the creditors and the extent to which the settlement is the product of an arms-length negotiation.

37.     The Debtors satisfy these standards with respect to the Settlement Agreement.  The first two factors of the *Jackson Brewing* balancing test, taken together, suggest that the Settlement Agreement is fair, reasonable, and in the best interest of the estate.  Cobalt is confident that these claims have merit and that Angolan Subsidiaries would ultimately prevail in these arbitrations. However, there is no certainty of success in a highly complex arbitration.  Despite Cobalt's belief that the Angolan Subsidiaries would prevail, if the Angolan Subsidiaries pursued these claims

---

[7]     Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Authorizing the Debtors to proceed with this Order, in accordance with the Consent Agreement, falls squarely within the spirit of Rule 9019, if not the letter, as well as the Bankruptcy Code's predilection for compromise.  Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

through to an arbitral award, under the current schedule, these claims would not be fully adjudicated until the end of next year.  Following an arbitral award, the Angolan Subsidiaries still would also face significant risk with enforcing this award against a foreign, government-owned entity.  Even if enforceable, the award could be structured over a longer time horizon.  In contrast, the settlement provides certainty in the amount and timing of payments.  It also monetizes a significant asset and introduces incremental liquidity to the Debtors' estates.  The arbitration proceedings imposed significant costs by diverting the time and monetary resources in the months leading up to the Debtors' chapter 11 filing, and would continue to do so if not resolved.  The settlement allows Cobalt's management team to focus their efforts on managing the Debtors' sale and restructuring process through these chapter 11 proceedings.

38.     This settlement also allows Cobalt to monetize its claims against Sonangol and its Angola assets now—otherwise impossible given the timeline for the arbitrations and the inability to effectively market the Angola assets without extensions of the underlying concessions.  And, moreover, even if extensions could be obtained, it would offer no certainty of value that could be realized, especially in the current circumstances.

39.     The Settlement Agreement meets other factors that bear on approval of the compromise, as it benefits the creditors' interests and is truly the product of arms-length bargaining.  From the creditors' perspective, this Settlement Agreement brings value in the form of the $500 million settlement payment and mitigation of months or years of arbitration costs.  The Settlement Agreement is the product of extensive arms-length negotiations with Sonangol.  Cobalt has continuously worked to reach a resolution to these disputes, and its management team has made multiple trips to Angola for settlement discussions.  There is no concern that this Settlement

Agreement was the product of fraud or collusion.  For all of these reasons, the Debtors respectfully request that the Court approve this Settlement Agreement.

## **Notice**

40.     The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the indenture trustee for the Debtors' first lien notes; (d) the indenture trustee for the Debtors' second lien notes; (e) the indenture trustee for the Debtors' 2.625% senior convertible notes; (f) the indenture trustee for the Debtors' 3.125% senior convertible notes; (g) counsel to the parties referenced in clauses (c) to (f); (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; (l) Sonangol; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

## **No Prior Request**

41.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Houston, Texas
Dated: December 21, 2017          */s/ Zack A. Clement*
                                                   Zack A. Clement (Texas Bar No. 04361550)
                                                   **ZACK A. CLEMENT PLLC**
                                                   3753 Drummond Street
                                                   Houston, Texas 77025
                                                   Telephone: (832) 274-7629

                                                   -and-

                                                   James H.M. Sprayregen, P.C.
                                                   Marc Kieselstein, P.C. (admitted *pro hac vice*)
                                                   Chad J. Husnick, P.C. (admitted *pro hac vice*)
                                                   Brad Weiland (admitted *pro hac vice*)
                                                   Laura Krucks (admitted *pro hac vice*)
                                                   **KIRKLAND & ELLIS LLP**
                                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                                   300 North LaSalle Street
                                                   Chicago, Illinois 60654
                                                   Telephone:     (312) 862-2000
                                                   Facsimile:      (312) 862-2200

                                                   *Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on December 21, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Zack A. Clement*
Zack A. Clement