# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR THE AMENDED JOINT CHAPTER 11 PLAN OF COBALT INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Laura Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone:      (832) 274-7629

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF COBALT INTERNATIONAL ENERGY, INC., AND ITS DEBTOR AFFILIATES.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE SECTION ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- ESTIMATED FUTURE NET RESERVES AND PRESENT VALUE THEREOF;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;

- TIMING AND AMOUNT OF FUTURE PRODUCTION OF OIL AND NATURAL GAS;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES, INCLUDING FUTURE DEVELOPMENT COSTS;

- **DRILLING OF WELLS, INCLUDING THE DEBTORS' IDENTIFIED DRILLING LOCATIONS;**

- **SUCCESSFUL RESULTS FROM THE DEBTORS' IDENTIFIED DRILLING LOCATIONS;**

- **COSTS OF DEVELOPING THE DEBTORS' PROPERTIES AND CONDUCTING OTHER OPERATIONS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;**

- **UNCERTAINTY REGRADING THE DEBTORS' FUTURE OPERATING RESULTS; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE PERFORMANCE, IF ANY.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD IMPACT THE DEBTORS' ACTUAL FUTURE PERFORMANCE, IF ANY. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES, THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS AND MARKET CONDITIONS; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND WILL BE AMENDED PRIOR TO THE HEARING TO CONSIDER ADEQUACY OF THIS DISCLOSURE STATEMENT AND THE RELATED SOLICITATION PROCEDURES TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT THE RESULTS OF THE AUCTION, IF ANY, FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................................1

II.     PRELIMINARY STATEMENT .........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ............................................................................................................................4

        A.      What is chapter 11? ...................................................................................................4
        B.      Why are the Debtors sending me this Disclosure Statement? ....................................4
        C.      Am I entitled to vote on the Plan? .............................................................................4
        D.      What will I receive from the Debtors if the Plan is consummated? ...........................5
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
                Priority Tax Claim? ...................................................................................................7
        F.      Are any regulatory approvals required to consummate the Plan? ..............................7
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ......7
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?" .......................................................................................................7
        I.      What are the sources of Cash and other consideration required to fund the Plan? ...........8
        J.      Is there potential litigation related to the Plan? ........................................................8
        K.      Will the final amount of Allowed Subsidiary General Unsecured Claims and Allowed
                Cobalt General Unsecured Claims affect my recovery under the Plan? ...................8
        L.      How will the release of Avoidance Actions affect my recovery under the Plan? ..........9
        M.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ......9
        N.      What is the effect of the Plan on the Debtors' ongoing business? ...........................10
        O.      Could subsequent events potentially affect recoveries under the Plan? ..................10
        P.      Do the Debtors recommend voting in favor of the Plan? .........................................11

IV.     OVERVIEW OF THE PLAN .............................................................................................11

        A.      General Settlement of Claims and Interests ............................................................11
        B.      Restructuring Transactions ......................................................................................11
        C.      Sale Transactions .....................................................................................................11
        D.      Unimpairment of the First Lien Notes and the Second Lien Notes in Accordance with
                Section 1124(2) of the Bankruptcy Code ................................................................12
        E.      Satisfaction of the First Lien Notes and Second Lien Notes ...................................12
        F.      The Plan Administrator ............................................................................................12
        G.      Disputed Claims Reserve .........................................................................................13
        H.      Corporate Action ......................................................................................................13
        I.      Recoveries to Certain Holders of Claims and Interests ...........................................14
        J.      Releases ....................................................................................................................14

V.      VOTING AND CONFIRMATION ....................................................................................17

        A.      Class Entitled to Vote on the Plan ...........................................................................17
        B.      Votes Required for Acceptance by a Class ..............................................................17
        C.      Certain Factors to Be Considered Prior to Voting ..................................................18
        D.      Solicitation Procedures ............................................................................................18
        E.      Voting Procedures ....................................................................................................19
        F.      Plan Objection Deadline ..........................................................................................21
        G.      Confirmation Hearing ..............................................................................................21

VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW..........21

       A.    Cobalt's Position in the Oil and Gas Industry ..............................................21
       B.    Cobalt's History ..................................................................................22
       C.    Cobalt's Current Assets and Operations ....................................................23
       D.    Cobalt's Capital Structure ......................................................................26

VII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS .............................................28

       A.    Marketing of Assets ..............................................................................29
       B.    Attempted Sale of the Angolan Assets and Related Arbitration ......................29
       C.    Ongoing Litigation and the SEC Investigation ...........................................30
       D.    Debt Transactions ................................................................................32
       E.    2017 Interest Payments .........................................................................33
       F.    Committee Investigation Regarding Prepetition Debt Transactions .................33

VIII.  EVENTS OF THE CHAPTER 11 CASES ...............................................................34

       A.    First/Second Day Relief .........................................................................34
       B.    Other Procedural and Administrative Motions ...........................................35
       C.    Litigation Matters................................................................................35
       D.    Schedules and Statements ......................................................................36
       E.    Appointment of Official Committee ..........................................................36
       F.    Sales Incentive Plan .............................................................................36
       G.    Sonangol Settlement .............................................................................36
       H.    Investigation.......................................................................................37
       I.    Expected Timetable of the Chapter 11 Cases and the Marketing Process .......38

IX.    RISK FACTORS .............................................................................................39

       A.    Bankruptcy Law Considerations .............................................................39
       B.    Risks Related to the Debtors' Businesses ..................................................43

X.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ....................48

       A.    Requirements for Confirmation of the Plan ...............................................48
       B.    Alternative Plans .................................................................................50
       C.    Acceptance by Impaired Classes...............................................................50
       D.    Confirmation Without Acceptance by All Impaired Classes ..........................50

XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
       PLAN...........................................................................................................51

       A.    Introduction........................................................................................51
       B.    Certain United States Federal Income Tax Consequences to the Debtors .....................53
       C.    Certain United States Federal Income Tax Consequences to U.S. Holders of Allowed
             Claims...........................................................................................................53
       D.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims ..........56
       E.    Information Reporting and Back-Up Withholding .......................................58

XII.   RECOMMENDATION .....................................................................................59

**EXHIBITS**

EXHIBIT A      Chapter 11 Plan

EXHIBIT B      Information to be included in the Disclosure Statement Supplement

## I.      INTRODUCTION

Cobalt International Energy, Inc. ("Cobalt") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with the solicitation of acceptances with respect to the Debtors' *Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Plan"), dated January 23, 2018.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Cobalt and each of its five affiliated Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

Founded in 2005 and headquartered in Houston, Texas, Cobalt owns valuable offshore oil and gas assets that they have acquired and prepared for development for years.  Unfortunately, a number of factors—such as a failed sale of Cobalt's Angolan assets and related litigation, the prolonged downturn in the exploration and production industry, and nearly $3.0 billion of funded indebtedness—have interfered with Cobalt's efforts to date.  Cobalt intends to use the Chapter 11 Cases to overcome these impediments and drive their sale and restructuring efforts to conclusion with a value-maximizing transaction.  More specifically, the Debtors intend to move these cases toward a successful sale (and distribution of sale proceeds) under an efficient and expeditious chapter 11 schedule and related bidding procedures.

The Debtors have unsuccessfully attempted to sell their assets outside of chapter 11 since 2015, and now time is of the essence.  By June 2018, the Debtors must either commence a unit saving drilling operation at the Debtors' North Platte discovery in order for the Debtors to maintain their interest in their North Platte discovery or obtain a Suspension of Production ("SOP") from the U.S. government.  A sale must therefore be closed with sufficient time for the purchaser to execute such a complex operation.  In addition, because the Debtors are self-financing the Chapter 11 Cases, the Debtors must move swiftly and not exceed their available liquidity.  Recognizing the need to move expeditiously through chapter 11, on December 14, 2017, the Debtors' filed a motion [Docket No. 15] (the "Bid Procedures Motion") seeking Bankruptcy Court approval of certain bidding procedures and a timeline for the sale process.  On January 25, 2018, the Court entered an order [Docket No. 299] granting the relief requested in the Bid Procedures Motion and established (i) 5:00 p.m. (prevailing Central Time) on February 22, 2018 for the final bid deadline for all Sale Transactions, and (ii) 10:00 a.m. (prevailing Central Time) on March 6, 2018 for an Auction, if needed.

Cobalt holds assets in the United States Gulf of Mexico and in the waters off the coasts of the Republic of Angola and the Gabonese Republic in West Africa.  More specifically, the Debtors have four named discoveries in the Gulf of Mexico, which include North Platte, Shenandoah, Anchor, and Heidelberg.  Cobalt is the operator of North Platte and holds a non-operating working interest in Shenandoah, Anchor, and Heidelberg.  Heidelberg began initial production in January 2016 while North

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Platte, Shenandoah, and Anchor have been fully appraised and are now in development. Additionally, the Debtors have made seven aggregate discoveries in offshore Angola and maintain a non-operating interest in offshore Gabon, where the Debtors have one discovery. Only one of Cobalt's assets—Heidelberg—is currently producing oil.

Beginning as early as 2015, Cobalt began a strategic review of its asset portfolio. As a result of the review, Cobalt decided to sell its Angola assets, which sale was ultimately unsuccessful following the termination of the $1.75 billion sale to Sonangol. Following the failed Angola sale and initial marketing of certain Gulf of Mexico assets, Cobalt determined to pursue a sale of all of its assets. Cobalt's marketing efforts and discussions with potential buyers for all or substantially all of Cobalt's assets or equity interests remain ongoing and will continue following the Petition Date.

For many months, Cobalt has engaged in active negotiations with Sonangol regarding a potential resolution of the parties' disputes. These settlement discussions recently culminated, on December 19, 2017, with Cobalt and Sonangol successfully reaching agreement on a settlement (subject to Bankruptcy Court approval).[2]  The key terms of the settlement include:  (a) $500 million payment by Sonangol to Cobalt, payable in two installments ($150 million paid by February 23, 2018, and the balance of $350 million paid by July 1, 2018); (b) the resolution of Cobalt's two International Chamber of Commerce arbitrations seated in the United Kingdom and Switzerland (and avoidance or mitigation of potentially substantial costs of continued arbitration); (c) a full release of all disputes, debts, and obligations between the parties (including Sonangol's release of any claim to the $250 million deposit paid in connection with the contemplated sale, which deposit is incremental to the $500 million to be paid by Sonangol to Cobalt); and (d) the transition of ownership of Cobalt's Angolan assets to Sonangol.

Following the settlement with Sonangol, the Debtors refocused their energy on selling their Gulf of Mexico assets. The Debtors contacted potential buyers, executed nondisclosure agreements, and received indications of interest from certain bidders.

The Debtors now seek to confirm the Plan which contemplates closing a Sale Transaction and distributing the Debtors' Net Cash. Specifically, under the terms of the Plan, holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holders' Claims and Interests:

- Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also an Allowed Secured Tax Claim, such Claim shall be treated as an Other Secured Claim if such Claim is not otherwise paid in full; *provided* that to the extent an Allowed Priority Tax Claim has not been satisfied prior to the Effective Date, no Cash payment shall be made on such Allowed Priority Tax Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable.

- Allowed Other Priority Claims will be paid in full, in Cash or otherwise provided treatment as to render such Claims unimpaired; *provided* that to the extent an Allowed Other Priority Claim has not been satisfied prior to the Effective Date, no Cash payment shall be made on such Allowed Other Priority Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable.

---

[2]   On December 21, 2017, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Performance Under Settlement Agreement, (II) Approving Settlement Agreement, and (III) Granting Related Relief* [Docket No. 127].

- Holders of Allowed Other Secured Claims will received either (a) payment in full in Cash, (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (c) such other recovery necessary to render such Claims unimpaired.

- On the Effective Date, (a) Class 3 shall be rendered Unimpaired pursuant to section 1124(2) of the Bankruptcy Code and satisfied in accordance with the terms of the First Lien Indenture or (b) if it is determined by a Final Order that Class 3 cannot be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or if any dispute regarding the Debtors' seeking to render Class 3 Unimpaired is consensually resolved, then holders of Allowed First Lien Notes Claims will receive payment in full in Cash.

- On the Effective Date, (a) Class 4 shall be rendered Unimpaired pursuant to section 1124(2) of the Bankruptcy Code and satisfied in accordance with the terms of the Second Lien Indenture or (b) if it is determined by a Final Order that Class 4 cannot be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or if any dispute regarding the Debtors' seeking to render Class 4 Unimpaired is consensually resolved, then holders of Allowed Second Lien Notes Claims will receive their Pro Rata share of the Second Lien Recovery up to payment in full in Cash of such holder's Allowed Second Lien Claim.

- Holders of Allowed Subsidiary General Unsecured Claims will receive their Pro Rata share of (a) the Debtors' Net Cash in excess of amounts necessary to (i) satisfy all Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims, in each case in full, in Cash, if any, and (ii) provide for the treatment specified in Article III of the Plan with respect to Class 3 and Class 4, plus (b) Cash recoveries (if any) on account of unencumbered assets (if any) at the applicable Debtor other than Cobalt not subject to adequate protection claims under the Cash Collateral Order.

- Holders of Allowed Cobalt General Unsecured Claims will receive their Pro Rata share of (a) the Debtors' Net Cash in excess of amounts necessary to (i) satisfy all Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Subsidiary General Unsecured Claims, in each case in full, in Cash, if any, and (ii) provide for the treatment specified in Article III of the Plan with respect to Class 3 and Class 4, plus (b) Cash recoveries (if any) on account of unencumbered assets (if any) at Cobalt not subject to adequate protection claims under the Cash Collateral Order.

- Section 510(b) Claims shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery.

- Intercompany Claims may be, at the option of the Debtors, either: (a) Reinstated as of the Effective Date or (b) cancelled; *provided* that no distribution shall be made on account of such Claims, and any Reinstatement will be solely to determine the right or entitlement of other holders of Claims to recoveries.

- Intercompany Interests may be, at the option of the Debtors, either: (a) Reinstated as of the Effective Date or (b) cancelled, and no distribution shall be made on account of such Interests.

- Interests in Cobalt will be canceled as of Effective Date.

3

The Debtors believe that the Plan maximizes stakeholder recoveries in these Chapter 11 Cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Kurtzman Carson Consultants LLC, the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by the Voting Deadline, i.e., March 26, 2018, at 4:00 p.m. prevailing Central Time.   Assuming the Plan receives the requisite acceptances the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.   In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment of creditors and similarly situated equity interest holders, subject to the priority distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtors as of the date the chapter 11 case is commenced.   The Bankruptcy Code provides that the debtors may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.   A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.   Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement will all holders of claims or interest whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.   Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."   Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Notes Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Second Lien Notes Claims | Unimpaired / Impaired | Entitled to Vote (Presumed to Accept if Unimpaired) |

4

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 5 | Subsidiary General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Cobalt General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 10 | Interests in Cobalt | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

Your ultimate distribution (if any) under the Plan depends on, among other things, the Debtors ongoing marketing and sale process and the sale proceeds ultimately realized.  In addition, your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE DEBTORS WILL DISTRIBUTE A SUPPLEMENT TO THIS DISCLOSURE STATEMENT ON OR BEFORE MARCH [9], 2018, OR AS SOON AFTER THE CONCLUSION OF THE AUCTION AS REASONABLY PRACTICABLE, THAT PROVIDES AN ESTIMATE OF THE PROJECTED RECOVERIES TO ALL HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN.   FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims |
|-------|-----------------------|-------------------------------------|----------------------------|
| 1 | Other Priority Claims | Each holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by | $0 |

---

[3]   Any recoveries under the Plan may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated and for which no contrary proof of claim has been filed; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed as of the Claims Objection Deadline.  Except for any Claim that is expressly Allowed pursuant to the Plan, any Claim that has been, or is hereafter, listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims |
|---|---|---|---|
| | | the holder of an Allowed Other Priority Claim and the Debtors; *provided* that to the extent an Allowed Other Priority Claim has not been satisfied during the Chapter 11 Cases, no Cash payment shall be made on such Allowed Other Priority Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable. | |
| 2 | Other Secured Claims | Each holder shall receive either (i) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $0 |
| 3 | First Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Claim, each holder of an Allowed First Lien Notes Claim shall receive treatment rendering its Allowed First Lien Notes Claims Unimpaired under applicable provisions of the Bankruptcy Code. | $500,000,000 in principal amount |
| 4 | Second Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Claim, each holder of an Allowed Second Lien Notes Claim shall receive either (i) its Pro Rata share of the Second Lien Recovery or (ii) in the Debtors' sole discretion, and solely in the event the Debtors' have sufficient Cash (including proceeds of a Sale Transaction) to provide for such treatment, such other treatment rendering its Allowed Second Lien Notes Claim Unimpaired under applicable provisions of the Bankruptcy Code. | $934,732,000 in principal amount |
| 5 | Subsidiary General Unsecured Claims | Each holder of an Allowed Subsidiary General Unsecured Claim shall receive its Pro Rata share of the Subsidiary General Unsecured Claim Recovery up to payment in full of such holder's Allowed Subsidiary General Unsecured Claim. | $[●] |
| 6 | Cobalt General Unsecured Claims | Each holder of an Allowed Cobalt General Unsecured Claim shall receive its Pro Rata share of the Cobalt General Unsecured Claim Recovery up to payment in full of such holder's Allowed Subsidiary General Unsecured Claim. | $[●] |
| 7 | Section 510(b) Claims | Each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. | $0 |
| 8 | Intercompany Claims | Intercompany Claims may be, at the option of the Debtors, either:  (i) Reinstated as of the Effective Date or (ii) cancelled; | N/A |

6

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims |
|---|---|---|---|
|  |  | *provided* that no distribution shall be made on account of such Claims, and any Reinstatement will be solely to determine the right or entitlement of other holders of Claims to recoveries. |  |
| 9 | Intercompany Interests | Intercompany Interests may be, at the option of the Debtors, either: (i) Reinstated as of the Effective Date or (ii) cancelled, and no distribution shall be made on account of such Interests. | N/A |
| 10 | Interests in Cobalt | Existing Interests in Cobalt shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in Cobalt on account of such Interests. | $0 |

### E. What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan.

### F. Are any regulatory approvals required to consummate the Plan?

No. There are no known regulatory approvals that are required to consummate the Plan. Nonetheless, assignment of certain federal leases may require the consent of the United States Department of the Interior or other governmental units. In addition, certain of the Debtors' operations may require federal approval as further described in Article IX.B of this Disclosure Statement.

### G. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to effectuate a Sale Transaction or restructuring transaction. It is possible that any alternative, including a potential sale under section 363 of the Bankruptcy Code may provide holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.A.2 of this Disclosure Statement, entitled "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis."

### H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code,

and means (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Plan will be funded by Cash on hand, the Sale Transaction Proceeds, and any other Cash received or generated by the Debtors.

**J.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code.

**K.      Will the final amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Subsidiary General Unsecured Claims total approximately $[●] and Cobalt General Unsecured Claims total approximately $[●].  Each holder of an Allowed Subsidiary General Unsecured Claim shall receive its Pro Rata share of the Subsidiary General Unsecured Claim Recovery on account of such interests.  Similarly, each holder of an Allowed Cobalt General Unsecured Claim shall receive its Pro Rata share of the Cobalt General Unsecured Claim Recovery on account of such interests.  Although the Debtors' estimate of the Subsidiary General Unsecured Claims and the Cobalt General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, Subsidiary General Unsecured Claims and Cobalt General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

The projected amount of Subsidiary General Unsecured Claims and Cobalt General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims could change as well, and such change could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters and investigations that arose in the ordinary course of operating their business and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims could change as well, and such change could be material.

Finally, the Debtors, the Plan Administrator, or the Committee may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims to change. These changes could affect recoveries for holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims, and such changes could be material.

> **L.     How will the release of Avoidance Actions affect my recovery under the Plan?**

In accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions. No Avoidance Actions shall revert to creditors of the Debtors.

The Committee asserts that a number of Avoidance Actions being waived constitute payments that might be recoverable under section 547 of the Bankruptcy Code.

> **M.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides releases to the Released Parties and exculpates the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.H of this Disclosure Statement, entitled "Releases."

The plan releases, among other claims, the claims in three pending state court derivative actions described in Article VII.C.2 hereof.

 The Debtors intend to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. The Debtors believe that the Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Restructuring Transactions contemplated by the Plan and the Debtors' overall restructuring efforts. The Debtors assert that all of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors for the benefit of all parties in interest. Accordingly, the Debtors believe that each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions. Based on the foregoing, the Debtors believe that the releases and exculpations in the plan are necessary and appropriate and meet the applicable legal standard.

The Committee contends that the Debtors' release of the Released Parties, including without limitation certain of the Debtors' current and former directors and officers named as defendants in the pending derivative actions, is not justified, and intends to object to the Plan on this basis. The Committee contends that such releases are (a) being provided for no consideration, (b) being provided to certain former directors and officers of the Debtors who are no longer serving in such capacities, and therefore could not have made any contributions to the Debtors' restructuring, (c) are not fair and equitable, and (d) are not in the best interest of the Debtors or creditors. The Debtors disagree.

The Committee believes that the proposed releases may affect recoveries by holders of Cobalt General Unsecured Claims and Subsidiary General Unsecured Claims. Cash recoveries from unencumbered assets comprise a portion of the treatment to be provided to holders of Cobalt General Unsecured Claims and Subsidiary General Unsecured Claims under the Plan. The claims asserted in the derivative actions are subject only to the adequate protection liens securing potential superpriority claims

up to the amount of diminution in value of their collateral, if any, as provided in the Cash Collateral Order. Absent any diminution in value of the prepetition secured lenders' collateral, the claims asserted in the derivative actions would be unencumbered assets, and the proceeds thereof (if any), would be available to general unsecured creditors. On the other hand, the costs of pursuing any such claims— which the Debtors believe have no merit—could deplete any potential recoveries to creditors.

The Plan also provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.H of this Disclosure Statement, entitled "Releases."

### N.     What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are selling all or substantially all of their businesses under chapter 11 of the Bankruptcy Code. As a result, Confirmation means that all or substantially all of the Debtors' assets or equity interests in the Debtors will be sold and the Debtors' remaining assets will be sold. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived. *See* Article IX of the Plan. On the Effective Date, the Plan Administrator shall be appointed. Among other things, the Plan Administrator shall be responsible for:  (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible; (b) resolving Disputed Claims; (c) making all distributions to holders of Allowed Claims in accordance with the Plan; (d) pursuing or otherwise commencing and litigating any Causes of Action. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### O.     Could subsequent events potentially affect recoveries under the Plan?

Potentially, yes. As described in greater detail below, the Debtors are conducting a marketing and Auction process seeking a potential purchaser(s) for all or substantially all of the Debtors' assets or the equity of Cobalt. The Debtors anticipate that the Auction, if any, related to this marketing process will take place on February 27, 2018, in accordance with the Bid Procedures Motion. If the Debtors elect to pursue one or more of the bids submitted at or before the Auction, they may amend the Plan to provide for the transfer of applicable assets to such winning bidder. The Debtors do not anticipate that such amendments would have a material negative effect on the estimated recoveries set forth herein.

**P.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.      OVERVIEW OF THE PLAN

The Plan provides for the sale of all or substantially all of the Debtors' business through a Sale Transaction.  The key terms of the Plan are as follows:

**A.      General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to holders of Allowed Claims in any Class are intended to be final.

**B.      Restructuring Transactions**

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (the "Restructuring Transactions"), including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) rejection or assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (5) subject to the occurrence of the Effective Date, the consummation of the transactions contemplated by the Sale Transaction.

**C.      Sale Transactions**

On and after the Confirmation Date, the Debtors shall be authorized to consummate the Sale Transactions pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order.

D.      **Unimpairment of the First Lien Notes and the Second Lien Notes in Accordance with Section 1124(2) of the Bankruptcy Code**

The Debtors intend to reinstate Class 3 and Class 4 pursuant to section 1124(2) of the Bankruptcy Code and satisfy the First Lien Notes and the Second Lien Notes in accordance with the First Lien Indenture and the Second Lien Indenture, as applicable, subject to a consensual resolution of such Claims and provided the Debtors have sufficient cash (including proceeds from the Sale Transaction) to provide for such treatment.  If the Debtors reinstate Class 3 and/or Class 4 pursuant to section 1124(2) of the Bankruptcy Code as set forth above, the Debtors intend to redeem the First Lien Notes and the Second Lien Notes, as applicable, shortly thereafter.  The Debtors believe that reinstating Class 3 and Class 4 pursuant to section 1124(2) of the Bankruptcy Code and redeeming the First Lien Notes and the Second Lien Notes shortly thereafter will materially reduce the amount of any "make-whole" premium owed under the First Lien Indenture and/or the Second Lien Indenture, as applicable.

E.      **Satisfaction of the First Lien Notes and Second Lien Notes**

On and after the Confirmation Date, the Debtors shall be authorized to pursue and consummate, in their sole discretion, such transactions, including the incurrence of indebtedness, the sale of securities, or the purchase of government securities as may be necessary or desirable to render Class 3 or Class 4 Unimpaired in accordance with section 1124(2) of the Bankruptcy Code and satisfy the First Lien Notes or Second Lien Notes in accordance with the terms of the First Lien Indenture or Second Lien Indenture, as applicable.

F.      **The Plan Administrator**

1.      **Rights and Powers of the Plan Administrator**

On the Effective Date, the Plan Administrator shall be appointed by the Debtors, in consultation with the Committee and the Second Lien Ad Hoc Group (unless the Allowed Second Lien Notes Claims are paid in full, in cash on the Effective Date or receive such other treatment rendering the Allowed Second Lien Notes Claims Unimpaired).  The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of any and all persons acting as directors and officers (and other employees, as applicable) of the Debtors shall be deemed to have been terminated, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors and shall succeed to all of the powers of the Debtors' directors and officers under applicable law or otherwise.

Among other things, the Plan Administrator shall be responsible for:  (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible; (b) resolving Disputed Claims; (c) making all distributions to holders of Allowed Claims in accordance with the Plan; (d) pursuing or otherwise commencing and litigating any Causes of Action (other than those released herein or pursuant to any prior settlement approved by the Bankruptcy Court), and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the Plan Administrator to outweigh the costs associated therewith; (e) filing appropriate tax returns; and (f) administering the Plan in an efficacious manner.  The Plan Administrator shall be deemed to be substituted as the party-in-lieu of the Debtors and the Estates in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### 2. Plan Administrator Assets

On the Effective Date, the Plan Administrator Assets shall vest automatically in the Plan Administrator free and clear of all Liens, claims, encumbrances, and other interests. The Plan shall be considered a motion pursuant to sections 105, 363, and 365 of the Bankruptcy Code for such relief. The transfer of the Plan Administrator Assets to the Plan Administrator shall be made for the benefit and on behalf of holders of Claims receiving a distribution from proceeds of the Plan Administrator Assets. The Plan Administrator shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein. In connection with the transfer of the Plan Administrator Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Administrator will vest in the Plan Administrator and its representatives, and the Debtors and the Plan Administrator are authorized to take all necessary actions to effectuate the transfer of such privileges to the Plan Administrator.

### 3. Fees of the Plan Administrator and Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with the Plan Administrator's duties shall be paid on a monthly basis without any further notice to or action, Order, or approval of the Bankruptcy Court, in Cash if such amounts relate to any actions taken hereunder; *provided* that the Plan Administrator will only be reimbursed for its reasonable and documented out-of-pocket costs and expenses in accordance with the Wind Down Budget.

### G. Disputed Claims Reserve

On the Effective Date (or as soon as thereafter as is reasonably practicable), the Plan Administrator shall deposit in the Disputed Claims Reserve the Disputed Claims Reserve Amount. For the avoidance of doubt, there shall be no reserve required for Claims against the Debtors, to the extent such Claims are Assumed Liabilities or as released, discharged, or otherwise extinguished pursuant to the Plan, nor shall there by any reserve, holdbacks, escrows, or indemnities arising from the Sale Transaction Documentation or otherwise relating to the Sale Transaction.

### H. Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

The Plan Administrator shall dissolve all of the Debtors at any time following the Effective Date as determined to be appropriate or necessary by the Plan Administrator, in its reasonable discretion.

On the Effective Date, the terms of all directors, managers, and officers of all Debtors shall be deemed to have expired, all such directors, managers, and officers shall be released of their duties, and all actions solely in furtherance of the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by the Debtors, holders of

Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including the transfer of assets of the Debtors to the Plan Administrator and the dissolution or winding up of the Debtors.  The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, release, and other agreements or documents and take such other actions as they may deem in their sole discretion necessary or appropriate to effectuate and implement the provisions of the Plan.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## I.      Recoveries to Certain Holders of Claims and Interests

The recoveries to holders of Claims and Interests are described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

## J.      Releases

The Plan contains certain releases, as described in Article III.M of this Disclosure Statement entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

The Plan provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

The release, exculpation, and injunction provisions that are contained in the Article VIII of the Plan are copied in pertinent part below.  The release and related provisions set forth in Article VIII of the Plan remain the subject of an ongoing independent investigation by the Committee of pending and potential claims and Causes of Action held by the Debtors' Estates, as described in Article VIII.H of this Disclosure Statement.

### 1.      Release of Liens

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases.

2.      **Debtor Release**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

3.      **Third Party Release**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or

15

before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Article VIII.C of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

4.      Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:    (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of

16

or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Plan.

6. **SEC Rights Reserved**

Nothing in the Plan or the Confirmation Order (i) releases any Entity other than the Debtors from any Claim or cause or action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Claims, causes of action, proceedings or investigations against any Entity other than a Debtor in any forum.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

## V. VOTING AND CONFIRMATION

### A. Class Entitled to Vote on the Plan

As described more fully above, Class 4 (Second Lien Notes Claims), Class 5 (Subsidiary General Unsecured Claims), and Class 6 (Cobalt General Unsecured Claims) are the only classes entitled to vote to accept or reject the Plan (the "Voting Classes").

If your claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package or a Ballot.  If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provide to you.

### B. Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.      **Certain Factors to Be Considered Prior to Voting**

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Compensation Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of holders within the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to Article IX hereof, entitled "Risk Factors."

D.      **Solicitation Procedures**

1.      **Solicitation Agent**

The Debtors retained Kurtzman Carson Consultants LLC ("KCC") to act, among other things, as the solicitation agent (the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.

2.      **Solicitation Package**

Holders of Claims who are entitled to vote to accept or reject the Plan as of February 20, 2018 (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

3.      **Distribution of the Solicitation Package and Plan Supplement**

The Debtors will cause KCC to distribute the Solicitation Packages to holders of Claims in the Voting Classes on or before **February 26, 2018 (or as soon as practicable thereafter)**, which will be at least **28 days** before the Voting Deadline (i.e., March 26, 2018, at 4:00 p.m., prevailing Central Time).

The Solicitation Package (except for the Ballots) may also be obtained: (a) from KCC by (i) visiting https://www.kccllc.net/cobalt, (ii) writing to KCC at Cobalt International Energy, Inc., Disclosure Statement / Plan Requests, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (iii) emailing cobaltinfo@kccllc.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov.

At least five (5) days prior to the Voting Deadline, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://www.kccllc.net/cobalt. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement: (a) from KCC by (i) visiting https://www.kccllc.net/cobalt, (ii) writing to KCC at Cobalt International Energy, Inc., Disclosure Statement / Plan Requests, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (iii) emailing cobaltinfo@kccllc.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov.

As described above, certain holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. In addition, certain holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote. Such holders will receive only the Confirmation Hearing Notice and a non-voting status notice. The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

## E.    Voting Procedures

If, as of the Voting Record Date, you are a holder of a Class 4 Second Lien Notes Claim, Class 5 Subsidiary General Unsecured Claim, or Class 6 Cobalt General Unsecured Claim you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided. If your Claim or Interest is not included in the Voting Class, then you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

### 1.    Voting Deadline

The deadline to vote on the Plan is **March 26, 2018, at 4:00 p.m., prevailing Central Time** (the "Voting Deadline"). To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by KCC no later than the Voting Deadline.

### 2.    Voting Instructions

As described above, the Debtors have retained KCC to serve as the Solicitation Agent for purposes of the Plan. KCC is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| BALLOTS |
|---|
| To be counted, all Ballots must be **actually** **received** by KCC by the Voting Deadline, which is **March 26, 2018, at 4:00 p.m., prevailing Central Time**, at the following address:<br><br>Cobalt International Energy, Inc.<br>Ballot Processing<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, California 90245<br><br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by KCC at:<br>(866) 967-1782. |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots much be properly executed, completed, and delivered according to their applicable voting instructions by: (i) first class mail, in the return envelope provided with each Ballot; (ii) overnight courier; or (iii) hand-delivery, so that the Ballots are **actually** **received** by KCC no later than the Voting Deadline at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such holder. By signing and returning a Ballot, each holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

The Plan also provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan**

3.      **Ballots Not Counted**

No Ballot will be counted toward Confirmation if, among other things:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Solicitation Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

F.      **Plan Objection Deadline**

Parties must object to Confirmation of the Plan by **March 26, 2018, at 4:00 p.m., prevailing Central Time** (the "Plan Objection Deadline").  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors, counsel to the Committee, and certain other parties in interest so that they are **actually** **received** on or before the Plan Objection Deadline.

G.      **Confirmation Hearing**

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing.  The Confirmation Hearing is scheduled to commence on **March 30, 2018, at 9:30 a.m., prevailing Central Time**, before the Honorable Judge Marvin Isgur, in Courtroom 404, 4th floor of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Houston, Texas, 77002.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

# VI.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

A.      **Cobalt's Position in the Oil and Gas Industry**

The oil and gas industry is typically divided into three major sectors: "upstream," "midstream," and "downstream."  E&P businesses that extract oil, gas, and other hydrocarbons—like Cobalt—comprise the upstream sector.  The midstream sector includes companies engaged in gathering, transporting, and storing the (unrefined) hydrocarbons.  The downstream sector is comprised of refiners, distributors, and marketers of (refined) hydrocarbon products.

Cobalt's assets are focused in the Gulf of Mexico deepwater basin, the Kwanza basin offshore Angola, and the Gabon basin.  The Gulf of Mexico's deepwater oil basin is one of the most prolific in the world and has been a focus for major oil exploration companies for more than three decades.  The Kwanza basin and the Gabon basin are located off the coast of West Africa.

Pinpointing the right location to drill and extract oil and gas from a basin can be difficult and often involves specialized techniques and technology.  Cobalt, for instance, uses extensive seismic data,

among other things, to identify potential drilling targets. Despite the sophisticated nature of this technology (and others like it), predictions are often inexact. Identifying promising drilling targets requires the knowledge and training of experienced geologists, engineers, and other oil and gas experts.

Generally, while rewards can be large, deepwater drilling is significantly more capital intensive than drilling on land. After a company identifies an appropriate target, it usually drills an exploration well to determine whether its initial analysis was accurate and to determine the extent of reservoir volumes.

Once an exploration well is drilled, the company must conduct various analyses to determine whether—and how much—oil and gas can be extracted from the well. A well test measures flow rates, properties of fluid or gas produced, and surface pressures, all of which provide an E&P company with information necessary to better predict the potential of each well. In deepwater development, wells are drilled and typically tied back to a floating platform system (a "FPS") or other production and processing facility. The FPS separates the oil, water, and gas from each other. The oil is pumped into a pipeline and delivered to a receiving terminal onshore. The gas is compressed into a gas pipeline and sold into an onshore distribution system. The water is treated and pumped overboard.

Each of the above steps depends on sophisticated technology and highly skilled personnel, and each carries a different level of uncertainty and risk. At each step, an E&P company must make complicated decisions regarding the viability—both technological and economic—of any given well or reservoir.

### B.     Cobalt's History

Cobalt was founded in November 2005 as a private company in Houston, Texas. On December 15, 2009, Cobalt executed an initial public offering of equity (the "IPO") with an approximately $4.5 billion market capitalization. Net proceeds from the IPO were used to fund capital expenditures, in particular Cobalt's exploration program, and its related operating expenses. Cobalt's common stock traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "CIE" since the IPO until it was notified by the NYSE, on December 13, 2017, that the NYSE would immediately commence delisting proceedings. Cobalt's common stock was officially delisted as of January 16, 2018. Cobalt's common stock began trading on the over the counter market on December 14, 2017.

Since its founding in 2005, Cobalt has had an ongoing focus on deepwater exploration in a limited number of places—the Gulf of Mexico and offshore West Africa. Through strategic acquisitions and exploration discoveries in both locations, Cobalt has historically delivered significant shareholder value. The commodity downturn and lack of capital resources, however, made developing the assets impossible. Thus, Cobalt started exploring asset sales.

#### 1.     Subsalt and Pre-Salt Focus

Cobalt focuses on deepwater offshore areas where geology exhibits the potential for subsalt or pre-salt discoveries. Subsalt exploration refers to the identification of oil deposits below impermeable layers of salt that have deformed and moved vertically from their original position. These layers of salt and their position relative to the surrounding and underlying rocks is a principal control on hydrocarbon accumulations, especially in the Gulf of Mexico. To be successful, Cobalt must rely upon individuals who have both an advanced understanding of these complex systems and the capability to utilize advanced seismic imaging technologies.

Pre-salt exploration, on the other hand, refers to the identification and discovery of oil accumulations trapped in formations that are beneath, and older, than the original in-place salt layer.

22

These pre-salt layers were formed more than 100 million years ago.  In pre-salt areas, exploration is focused on potential reservoirs that were deposited prior to salt formation.

Advanced seismic imaging, integrated regional geologic interpretation, and a focus on the fundamentals of petroleum geology are keys to success in subsalt and pre-salt exploration.  Consequently, Cobalt has spent over $400 million since its inception to acquire and process the highest quality seismic data and technology.  This investment in seismic data and its utilization by Cobalt's experienced workforce has been essential to Cobalt's success in identifying prospects, acquiring leases related thereto, and successfully drilling discoveries in the Gulf of Mexico and West Africa.  As a result of these efforts, Cobalt owns a significant amount of seismic data, as follows:

- West Africa:  approximately 6,950 square miles of three dimensional ("3-D") seismic data and approximately 125,000 linear miles of two dimensional ("2-D") seismic data.

- Gulf of Mexico:  (a) approximately 32,400 square miles of 3-D depth-migrated seismic data, (b) approximately 8,500 square miles of wide-azimuth 3-D depth data, (c) proprietary reprocessing of approximately 7,600 square miles of 3-D seismic data, and (d) approximately 115,000 linear miles of 2-D pre-stack, depth-migrated seismic data.

Cobalt's investment in seismic data, technology, and its workforce has significantly enhanced its ability to quickly identify the geological and geophysical characteristics of the subsalt and pre-salt formations.  This has directly led to Cobalt's early access to leading positions in both the Gulf of Mexico and West Africa.

## C.    Cobalt's Current Assets and Operations

As of the Petition Date, the Debtors employed approximately 82 full-time employees, none of which are represented by a collective bargaining agreement.  In addition, certain of Cobalt's non-Debtor affiliates collectively employ approximately three full time employees in Angola.  Cobalt is headquartered in Houston, Texas and holds interests in the Gulf of Mexico and West Africa.  A corporate organizational chart is set forth below.



### 1.      Gulf of Mexico Assets

Cobalt holds an ownership interest in approximately 121 blocks in the Gulf of Mexico, representing approximately 368,532 net acres leased.  Cobalt's Gulf of Mexico assets include four major discoveries:  (a) North Platte, (b) Shenandoah, (c) Anchor, and (d) Heidelberg fields.

#### i.      North Platte

The North Platte field is located approximately 190 miles south of Port Fourchon off the Louisiana coast in 4,500 feet of water in the "Garden Banks" area.  North Platte is the only field in which the Debtors serve as operator.  In 2012, the Debtors announced the North Platte discovery well, and subsequently drilled five additional penetration wells to appraise the field.  On December 15, 2017, the Debtors submitted a SOP to the Bureau of Safety and Environmental Enforcement ("BSEE") for approval.  The SOP provides a schedule of key deliverables to develop the North Platte unit.  The SOP suspends the requirement of the operator to conduct further unit saving drilling operations under the terms of the applicable Leases.  In the event the SOP is not approved by BSEE, a unit saving drilling operation will need to commence by June 2018.  Therefore, as a contingency, the operator is in the planning stages of an additional well—North Platte #5—as a unit saving operation.  The Debtors own a 60-percent working interest in the North Platte unit, with the remaining 40-percent held by Total E&P USA, Inc. ("Total E&P") as a non-operating party.  The estimated gross recoverable resource range for North Platte is 500 to 650 million barrels of oil equivalent.

The Debtors have already committed to pay a gross total of approximately $166 million pursuant to outstanding authorizations for expenditures (each, an "AFE") in connection with developing the North Platte unit and drilling the North Platte #5 well as part of a unit saving operation in the event an SOP is not approved by BSEE.  If the BSEE does not approve an SOP, failure to drill a well will result in automatic termination of the Leases and the elimination of the Debtors' Working Interests therein.  The Debtors' net share of these committed expenditures is approximately $111 million, with the balance to be reimbursed by Total E&P on account of joint interest billings if Total E&P elects to participate.

The Debtors also expect to incur additional expenditures required to fulfill the commitments outlined in the SOP.  Failure to authorize these expenditures will likely result in BSEE not approving the SOP, thereby triggering the requirement that the Operator drill North Platte #5 as a unit saving operation. The Debtors' net share of these uncommitted expenditures is approximately $41 million, with the balance to be reimbursed by Total E&P on account of joint interest billings.  Failure to make these payments will result in economic losses to the Debtors and their bankruptcy estates by diminishing the value of the Debtors' interests in their Leases to the detriment of all parties in interest, including potential purchasers.

### ii.      Shenandoah

The Shenandoah field is located approximately 170 miles south of Port Fourchon off the Louisiana coast in 5,800 feet of water in the "Walker Ridge" area.  The Debtors own a 20-percent working interest in Shenandoah as a non-operating party.  In 2009 the Shenandoah discovery well was drilled and subsequently seven additional penetration wells were completed to appraise the field, with the most recent in April 2017.  The estimated gross recoverable resource range for Shenandoah is 165 to 300 million barrels of oil equivalent.

Historically, the Debtors have paid approximately $3.5 million in joint interest billings on a monthly basis in connection with Shenandoah.  The Debtors may incur additional expenditures at or exceeding the historical monthly average with respect to Shenandoah in the twelve months following the Petition Date.  Specifically, expenditures may include studies, surveys, integrated project teams, long leads, and drilling expenses, among others.  Failure to participate in any well AFE for the construction, fabrication, or acquisition of a well to produce hydrocarbons (a "Fabrication AFE") will force the Debtors to forfeit their share of production from that well.  Further, failure to participate in any other AFEs will result in the imposition of underinvestment penalties under the Shenandoah Joint Operating Agreement.

### iii.      Anchor

The Anchor field is located approximately 150 miles south of Port Fourchon off the Louisiana coast in 5,183 feet of water in the "Green Canyon" area.  Chevron is the operator, and the Debtors own a 20-percent working interest as a non-operating party.  The initial discovery well was drilled in 2014, with three additional penetration wells completed in 2015 and 2016 to appraise the field.  Currently, there are no plans to drill a well at Anchor in 2018.  The estimated gross recoverable resource range for Anchor under depletion is 330 to 600 million barrels of oil equivalent, while the estimated gross recoverable resource range with water injection support is 600 to 900 million barrels of oil equivalent, based on preliminary reservoir simulation modeling results.

Historically, the Debtors have paid approximately $2.6 million in joint interest billings on a monthly basis in connection with Anchor.  The Debtors have already committed approximately $19 million under existing AFEs relating to Anchor.  The Debtors also expect to incur additional expenditures with respect to Anchor in the twelve months following the Petition Date that are not currently committed through an AFE.  Specifically, the Debtors anticipate that expenditures may include studies, surveys, integrated project teams, and long leads, among others.  Failing to participate in any AFEs in connection with Anchor will result in the imposition of underinvestment penalties under the Anchor UOA.

####              iv.        Heidelberg

The Heidelberg field is located approximately 140 miles south of Port Fourchon off the Louisiana coast in 5,300 feet of water in the "Green Canyon" area. Anadarko Petroleum Corporation ("Anadarko") is the operator, and the Debtors own a 9.375-percent working interest as a non-operating party. The Heidelberg field began initial production in early 2016. Heidelberg is currently producing approximately 36,000 barrel of oil equivalents per day (gross) from five wells (the fifth production well was completed in early 2017). Of the leases in which the Debtors hold a working interest, Heidelberg is the only one currently producing oil and gas. Anadarko plans to drill an additional production well in 2018.

Historically, the Debtors have paid approximately $1.9 million in joint interest billings on a monthly basis in connection with Heidelberg. The Debtors also make approximately $515,000 in royalty payments and approximately $635,000 in production sale expenditures each month in connection with Heidelberg. The Debtors expect to incur additional expenditures with respect to Heidelberg in the twelve months following the Petition Date that are not currently committed through an AFE. In particular, the Debtors anticipate that it will be economically beneficial to drill a well and perform subsurface studies, among other expenditures, in order to maximize the value of their Heidelberg Leases. Failure to make these payments will likely result in severe economic losses to the Debtors and their bankruptcy estates by diminishing the value of the Debtors' interests in their Leases, to the detriment of all parties in interest, including potential purchasers. Specifically, failure to participate in any Fabrication AFEs in connection with Heidelberg will force the Debtors to forfeit their share of production from that well. Further, failure to participate in any other AFEs will result in the imposition of underinvestment penalties under the Heidelberg UOA.

####       2.        West Africa Assets

Through non-Debtor affiliates, Cobalt holds an ownership interest in three blocks in West Africa, representing approximately 4.6 million gross acres leased. Cobalt is the operator of, and holds a 40-percent working interest in, two of these three blocks (Block 20 and Block 21), which are located off the coast of Angola and collectively represent 2.4 million of the total 4.6 million gross acres. As discussed below, Block 20 and Block 21 are the subject of ongoing arbitration due to a failed asset purchase agreement. In addition to its interests in Blocks 20 and 21, Cobalt holds a 21.25-percent interest in the Diaba license, which is located off the coast of Gabon. The Diaba license is operated by Total Gabon and represents the remaining 2.2 million of the Cobalt's total 4.6 million gross acres. As described below, as part of the settlement with Sonangol, the Debtors will be transferring their Angolan assets to Sonangol.

#### D.        Cobalt's Capital Structure

The Debtors have approximately $2.8 billion in total funded debt. The following table depicts the Debtors' prepetition capital structure:

| Long Term Debt Obligations | Outstanding Principal |
|---|---|
| 10.75% first lien notes due 2021 | $500.0 million |
| 7.75% second lien notes due 2023 | $934.7 million |
| 2.625% senior unsecured notes due 2019 | $619.2 million |
| 3.125% senior unsecured notes due 2024 | $786.9 million |
| **Total** | $2.8 billion |

### 1.  First Lien Notes

The Debtors have approximately $500.0 million principal amount of outstanding 10.75% first lien secured notes due 2021, issued under that certain Senior Secured Notes Indenture dated as of December 6, 2016, by and among Cobalt, as issuer, the remaining Debtors, as guarantors,[4] and Wilmington Trust, National Association, as the trustee and collateral agent.  The first lien notes mature in 2021 and require semiannual coupon payments at an interest rate of 10.75 percent per year.  The first lien notes are secured by first-priority liens on substantially all of the assets of Cobalt and the guarantors, including, among other assets, 65 percent of Cobalt International, L.P.'s ownership interests in non-debtor Cobalt International Energy Overseas, Ltd.[5]

### 2.  Second Lien Notes

The Debtors have approximately $934.7 million principal amount of outstanding 7.75% second lien secured notes due 2023 issued under that certain Senior Secured Notes Indenture dated as of December 6, 2016,[6] by and among Cobalt, as issuer, the guarantors, and U.S. Bank National Association, as trustee and collateral agent.  The second lien notes mature in 2023 and require semiannual coupon payments at an interest rate of 7.75 percent per year.  The second lien notes are secured by second-priority liens on the same collateral securing the first lien notes.  Cobalt, the guarantors, and Wilmington Trust, National Association, as trustee and collateral agent are parties to an intercreditor agreement, dated as of December 6, 2016, that governs the relative rights of the parties thereto and provides other protections for the benefit of such parties.

### 3.  2.625% Senior Unsecured Notes

The Debtors have approximately $619.2 million principal amount of outstanding 2.625% convertible senior unsecured notes due 2019, issued pursuant to that certain Senior Indenture dated as of December 17, 2012,[7] by and among Cobalt, as issuer, and Wells Fargo Bank, National Association, as trustee.  The 2.625% unsecured notes mature in 2019 and require semiannual coupon payments at an interest rate of 2.625 percent per year.  The 2.625% unsecured notes are of equal priority of payment to the obligations under the 3.125% unsecured notes.  Under the indenture, the 2.625% unsecured notes are convertible before maturity at the option of the holder to approximately 28.02 shares of common stock per $1,000 in principal amount, before giving effect to the one-for-fifteen reverse stock split of Cobalt's common stock and subject to certain other adjustments.  On June 19, 2017, at the time of the one-for-fifteen reverse stock split, the conversion rate for the 2.625% unsecured notes was adjusted to approximately 1.87 shares of common stock per $1,000 in principal amount.

---

[4]   The guarantors are Cobalt International Energy GP, LLC; Cobalt International Energy, L.P.; Cobalt GOM LLC; Cobalt GOM #1 LLC; and Cobalt GOM #2 LLC.

[5]   Cobalt International Energy Overseas, Ltd. has indirect ownership interests in certain non-debtors conducting oil and gas exploration and production operations in the coastal waters off of Angola and the Gabonese Republic.

[6]   The Senior Secured Notes Indenture dated as of December 6, 2016 for the second lien notes was amended and supplemented by the First Supplemental Indenture dated as of January 30, 2017, the Second Supplemental Indenture dated as of April 24, 2017, and the Third Supplemental Indenture dated as of May 18, 2017.

[7]   The Senior Indenture dated as of December 17, 2012 was amended and supplemented pursuant to the First Supplemental Indenture dated as of December 17, 2012.

4.      **3.125% Senior Unsecured Notes**

The Debtors have approximately $786.9 million principal amount of outstanding 3.125% convertible senior unsecured notes due 2024, issued pursuant to that certain Senior Indenture dated as of December 17, 2012,[8] by and among Cobalt, as issuer, and Wells Fargo Bank, National Association, as trustee.   The 3.125% unsecured notes mature in 2024 and require semiannual coupon payments at an interest rate of 3.125 percent per year.   The 3.125% unsecured notes are of equal priority of payment to the obligations under the 2.625% unsecured notes.   Under the indenture, the 3.125% unsecured notes are convertible before maturity at the option of the holder to approximately 43.36 shares of common stock per $1,000 in principal amount, before giving effect to the one-for-fifteen reverse stock split of Cobalt's common stock and subject to certain other adjustments.   On June 19, 2017, at the time of the one-for-fifteen reverse stock split, the conversion rate for the 3.125% unsecured notes was adjusted to approximately 2.89 shares of common stock per $1,000 in principal amount.

5.      **Common Stock**

As of November 30, 2017, Cobalt had approximately 29.9 million shares of common stock, par value $0.01 per share, issued and outstanding.   Cobalt has 133.3 million shares of authorized common stock.   Cobalt's common stock traded on the NYSE under the ticker symbol "CIE," after its IPO in 2009, until it was notified by the NYSE, on December 13, 2017, that the NYSE would immediately commence delisting proceedings.   Cobalt's common stock was officially delisted on January 16, 2018.   Cobalt's common stock began trading on the over the counter market on December 14, 2017.

6.      **Make-Whole Provisions Under the First Lien Indenture and the Second Lien Indenture**

The First Lien Indenture and the Second Lien Indenture each set forth a so-called "make whole" provision which, if enforceable, could result in an obligation to pay a premium pursuant to the First Lien Indenture or the Second Lien Indenture.   In particular, upon a bankruptcy filing, the First Lien Indenture and the Second Lien Indenture provide for automatic acceleration and trigger a "make-whole" premium. A "make-whole" premium is intended to compensate a noteholder for lost future interest in the event of early redemption or acceleration.   As is typical, the First Lien Indenture and the Second Lien Indenture each set forth a formula to calculate the "make-whole" premium upon acceleration.   Potential liability for any such "make-whole" premium and the amount thereof is further described in Article IX.A hereof.

## VII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

Approximately three years ago, the oil and gas industry entered what has become a sustained downward cycle that was brought on by low commodities prices.   This severe downturn has had a significant adverse effect on Cobalt's businesses, development capital and timing, and the price of its common stock.   Historically, prices for oil and natural gas have been volatile.   West Texas Intermediate ("WTI") oil prices peaked in mid-2014 at more than $115 per barrel before declining to approximately $35 per barrel by early 2016.   WTI prices have gradually risen to the current price of approximately $64 per barrel.

These declines materially reduced Cobalt's asset values and made it significantly less economical to drill deepwater wells.   Offshore drilling requires a higher initial capital expenditure than onshore

---

[8]     The Senior Indenture dated as of December 17, 2012 was amended and supplemented pursuant to the Second Supplemental Indenture dated as of May 13, 2014.

projects generally, but correspondingly can have a comparable return on investment over a longer relative period of time.

Facing deteriorating market conditions, significant debt obligations, and ongoing capital and operating expenditures that vastly exceeded revenue, Cobalt faced immediate challenges. Cobalt took aggressive and proactive steps to address these challenges by immediately implementing significant cost-cutting measures (including a significant reduction in work force and performance improvement initiatives) and exploring potential strategic select asset sales and an in-depth review of all assets and operations. In addition, Cobalt hired Kirkland & Ellis LLP and Lazard Frères & Co. LLC in August 2016 and Goldman, Sachs & Co. in September 2016 to assist with exploring restructuring alternatives. In September 2017, Cobalt retained Houlihan Lokey Capital, Inc. to assist with potential out-of-court sales, chapter 11 sales, and/or restructuring alternatives. Houlihan Lokey Capital, Inc. is Cobalt's sole M&A and financial restructuring advisor, as both Lazard Frères & Co. LLC and Goldman, Sachs & Co. are no longer retained by Cobalt.

Starting as early as 2015, Cobalt began working in earnest to consider alternatives to enhance liquidity and address its capital structure. To achieve an orderly restructuring and maximize the value of Cobalt's business, the Debtors and their advisors took a series of coordinated steps leading up to the filing of these chapter 11 cases.

### A.    Marketing of Assets

Beginning as early as 2015, Cobalt began a strategic review of its portfolio. As a result of the review, Cobalt decided to sell its Angola assets, which was ultimately unsuccessful following the termination of the $1.75 billion sale to Sonangol. Following the failed Angola sale and initial marketing of certain Gulf of Mexico assets, Cobalt determined to pursue a sale of all of its assets. Cobalt's marketing efforts and discussions with potential buyers for all or substantially all of Cobalt's assets remain ongoing and will continue following the Petition Date. Based on discussions with potential buyers, Cobalt believes that effecting these asset sales through an expedient chapter 11 process will maximize ultimate realized value for its stakeholders. Accordingly, the sale of all or substantially all of Cobalt's assets is the primary focused outcome of this chapter 11 process, as evidenced by the first day filing of a bid procedures and plan confirmation scheduling motion.

### B.    Attempted Sale of the Angolan Assets and Related Arbitration

On August 22, 2015, Cobalt's non-Debtor subsidiary that holds the Angolan assets entered into a Purchase and Sale Agreement (the "Angola SPA") to sell to an Angolan quasi-governmental entity, Sonangol, the entire issued and outstanding share capital of Cobalt's indirect, wholly-owned subsidiaries, CIE Angola Block 20 Ltd. and CIE Angola Block 21 Ltd. for $1.75 billion. CIE Angola Block 20 Ltd. and CIE Angola Block 21 Ltd. respectively hold Cobalt's 40 percent working interest in each of Block 20 and Block 21 offshore Angola. Pursuant to the Angola SPA, Sonangol made a $250 million initial payment to Cobalt. Cobalt currently holds the $250 million initial payment that Sonangol made under the Angola SPA. These amounts are comingled in Cobalt's general operating account and are not held in escrow. The requisite Angolan government approvals were not received within one year from the execution date and the Angola SPA terminated pursuant to its terms in August 2016. Under the Angola SPA, Cobalt is entitled to be put back in its original position as if no agreement had been entered into.

On March 8, 2017, Cobalt's non-Debtor subsidiary submitted a Notice of Dispute to Sonangol pursuant to the Angola SPA, and subsequently, on May 3, 2017, filed a Request for Arbitration ("RFA") with the International Chamber of Commerce ("ICC") against Sonangol for breach of the Angola SPA. Through this arbitration proceeding, Cobalt sought an award against Sonangol in excess of $2 billion, plus applicable interest and costs. Sonangol filed a counterclaim against Cobalt's non-Debtor subsidiary

seeking the repayment of the $250 million initial payment, plus interest and costs. The arbitral tribunal was constituted, and the parties agreed upon the Terms of Reference and the procedural timetable. The final hearing was scheduled for October 2019. In light of the Sonangol settlement, discussed below, the parties agreed to stay the arbitral proceedings until February 23, 2018. If Sonangol makes payment of $150 million by February 23, 2018, the parties have agreed that the procedural timetable in that arbitration will be extended by an additional four months. If the conditions for the settlement are fully met, the Parties have agreed that the arbitral proceedings will be terminated.

CIE Angola Block 21 Ltd, another non-Debtor subsidiary, also filed a separate RFA with the ICC against Sonangol Pesquisa e Produção, S.A ("Sonangol P&P") seeking recovery of over $162 million in unpaid cash calls, plus applicable interest and costs, representing the joint interest receivable owed to Cobalt for operations on Block 21 offshore Angola. The arbitral tribunal has been constituted, and the parties have agreed upon the Terms of Reference. The final hearing was initially scheduled for December 2018, but the parties have now agreed to a two-month stay in light of the settlement. This stay will likely affect the hearing date should the arbitration not be terminated in any case as a result of the settlement. If Sonangol makes the $150 million payment by February 23, 2018, the parties have agreed to terminate such arbitration.

### C. Ongoing Litigation and the SEC Investigation

Cobalt is currently a defendant in four material legal proceedings, together with former and current officers and directors and equity sponsors, namely: (a) *In re Cobalt International Energy, Inc. Securities Litigation*, No. 14-3428 (S.D. Tex. 2014); (b) *Gaines v. Bryant*, No. 2016-29850, District Court 295, Harris County, Texas, May 2016; (c) *McDonaugh v. Bryant*, No. 2016-82186, District Court 80, Harris County, Texas, November 2016; and (d) *Hafkey v. Bryant*, No. 2017-23329, District Court 295, Harris County, Texas, April 2017.

### 1. Securities Action

The securities action is comprised of two since-consolidated proceedings filed in the United States District Court for the Southern District of Texas against Cobalt, certain officers, directors, underwriters, and equity sponsors (the "Securities Action"). In both proceedings, the plaintiffs alleged two factually distinct groups of claims, one focused on potential violations of the United States Foreign Corrupt Practices Act ("FCPA") based on the relationship between Cobalt, Nazaki Oil and Gas, and senior Angolan officials, and a second focused on the performance of certain wells offshore Angola. The District Court entered an order [Docket No. 67] consolidating the two cases in March 2015. The consolidated amended complaint relies on the same underlying alleged misconduct and asserts violations of federal securities laws based on alleged misrepresentations and omission in Securities and Exchange Commission filings and other public disclosures, primarily regarding compliance with the FCPA with respect to Cobalt's Angolan operations and the performance of certain wells offshore Angola. In January 2016, the District Court denied Cobalt's motion to dismiss the Securities Action [Docket No. 108]. Thereafter, the plaintiffs to the Securities Action filed a motion for class certification [Docket No. 163], which the District Court granted in June 2017 [Docket No. 244]. On August 4, 2017, the United States Court of Appeals for the Fifth Circuit granted Cobalt permission to file an interlocutory appeal challenging the class certification order. On August 23, 2017, the District Court entered an order denying the defendants' motion for reconsideration of its order granting class certification [Docket No. 251]. Cobalt subsequently filed its appeal of the class certification order on October 10, 2017, the briefing for which is now complete. On December 14, 2017, Cobalt filed (i) a notice of suggestion of pendency of bankruptcy and (ii) an adversary proceeding and a motion seeking an order extending the automatic stay to or, in the alternative, enjoining the continued prosecution of the Securities Action against, the non-Debtor defendants in the Securities Action (the "Injunction Motion") [Adv. Pro. No. 17-03457, D.I. 2].

The District Court stayed the Securities Action the following day. The plaintiffs in the Securities Action opposed the Injunction Motion, and at a hearing held January 4, 2018, ultimately agreed to a one-time temporary stay of the Securities Action against the non-Debtor defendants until April 20, 2018. The agreed-upon temporary stay is not subject to further extension by the Debtors, who confirmed on the record that the Securities Action may continue against the non-Debtor defendants after April 20, 2018. On December 22, 2017, the plaintiffs moved to dismiss Cobalt from the Securities Action. The District Court denied the motion without prejudice on January 24, 2018, holding that the plaintiffs could reargue their motion 31 days after providing notice and an opportunity to object to class members via publication in Business Wire.

### 2.    Derivative Actions

**The Gaines Lawsuit**. The Gaines lawsuit is a shareholder derivative action against Cobalt, as a nominal defendant, certain current and former officers and directors, and equity sponsors. The Gaines plaintiffs allege that, among other things: (a) the officers and directors breached their fiduciary duties by making, and permitting Cobalt to make, alleged misrepresentations about the commercial viability of two of Cobalt's exploration wells offshore Angola; (b) certain officers received performance-based compensation in excess of that to which they were entitled absent the alleged wrongdoing; and (c) the equity sponsors owed a fiduciary duty to Cobalt as controlling stockholders and breached that duty by engaging in insider trading. The plaintiffs seek damages in the amount sustained by Cobalt as a result of the alleged breach of fiduciary duties and disgorgement of any performance-based compensation that would not have otherwise been received absent the alleged wrongdoing. In July 2016, Cobalt and its officers and directors filed their answer and special exceptions challenging the plaintiff's standing to bring such claims against them. The District Court heard arguments on the special exceptions in December 2016. The equity sponsors also filed their special exceptions challenging, among other things, the plaintiff's standing to bring such claims against them. By order dated March 17, 2017, the court overruled the equity sponsors' special exceptions. On December 14, 2017, Cobalt filed a notice of suggestion on pendency of bankruptcy.

**The McDonaugh Lawsuit**. The McDonaugh lawsuit is a shareholder derivative action against Cobalt, as a nominal defendant, and certain current and former officers and directors. The McDonaugh plaintiffs allege that, among other things: (a) the defendants breached their fiduciary duties by failing to maintain adequate internal controls and by causing or failing to prevent alleged misrepresentations and omissions in Cobalt's SEC filings and other public disclosures, including in relation to compliance with the FCPA with regard to Cobalt's Angolan operations and the performance of certain wells offshore Angola; (b) the defendants received compensation or other benefits in excess of that to which they were entitled absent the alleged wrongdoing; and (c) certain officers and directors engaged in unlawful trading and misappropriation of information. The plaintiffs seek damages in the amount sustained by Cobalt as a result of the alleged breach of fiduciary duties and disgorgement of any performance-based compensation that would not have otherwise been received absent the alleged wrongdoing. In January 2017, the defendants to the McDonaugh lawsuit filed their answer and special exceptions challenging the plaintiff's standing to bring such claims. On December 14, 2017, Cobalt filed a notice of suggestion on pendency of bankruptcy.

**The Hafkey Lawsuit**. The Hafkey lawsuit is a shareholder derivative action against Cobalt, as a nominal defendant, and certain current and former officers and directors. The Hafkey plaintiffs allege that, among other things: (a) current and former officers and directors breached their fiduciary duties by making, and permitting Cobalt to make, alleged misrepresentations about two of the exploratory wells offshore Angola; (b) certain officers received performance-based compensation in excess of that to which they were entitled absent the alleged wrongdoing; and (c) certain directors caused Cobalt to waste corporate assets by approving the payment of that allegedly inflated compensation. The plaintiffs seek

damages in the amount sustained by Cobalt as a result of the alleged breach of fiduciary duties and disgorgement of any performance-based compensation that would not have otherwise been received absent the alleged wrongdoing. The defendants filed their answer and special exceptions challenging the plaintiff's standing to bring such claims against Cobalt in June 2017. On December 14, 2017, Cobalt filed a notice of suggestion on pendency of bankruptcy.

**Committee Investigation Regarding Derivative Actions**. The Debtors propose to release claims asserted in the derivative actions, including claims against the Debtors' current and former directors and officers. The Committee has reviewed the derivative actions summarized above, including the special exceptions pleadings, court rulings and applicable law governing the cases. Based upon its review, the Committee believes the derivative actions assert viable Causes of Action and should not be released. The Debtors disagree. Notably, the court overruled the equity sponsors' challenge to the Gaines plaintiff's standing to bring suit in the Gaines lawsuit. It also overruled the equity sponsors' argument that the Gaines lawsuit failed to state a claim for insider trading. In January 2016, the District Court in the Securities Action denied the defendants' motion to dismiss the petitioner's amended complaint, which asserts violations of federal securities laws based on alleged misrepresentations and omissions in SEC filings and other disclosures relating to Cobalt's Angolan operations. The allegations made in the Securities Action arise from certain of the same facts underlying the allegations in the derivative actions. The Debtors dispute the claims asserted in the derivative actions and the Securities Action.

### 3.     The SEC Investigation

In March 2017, the SEC informed Cobalt that it had initiated an informal inquiry regarding the Sonangol Research and Technology Center (the "SRTC"). As background, in December 2011, Cobalt executed the Block 20 Production Sharing Contract under which Cobalt and BP Exploration Angola (Kwanza Benguela) Limited are required to make certain social contributions to Sonangol, including for the SRTC. In March 2017, Cobalt also received from the SEC a voluntary request for information regarding such inquiry. Cobalt cooperated with the SEC, providing requested information regarding the SRTC. The SEC also asked for, and Cobalt provided, information regarding other aspects of its Angolan operations, including two of its wells offshore Angola. On January 29, 2018, the SEC formally concluded its investigation into potential violations of the federal securities laws, including the Foreign Corrupt Practices Act, and advised that the SEC staff did not intend to recommend any enforcement action by the SEC against Cobalt.

### D.     Debt Transactions

### 1.     2016 Debt Exchange and Financing Transaction

The terms of Cobalt's unsecured debt largely allow Cobalt to exchange such unsecured debt for secured debt and common stock. On December 6, 2016, Cobalt entered into a purchase and exchange agreement with certain holders of its unsecured notes that provided Cobalt with incremental liquidity while significantly extending its debt maturity profile. Under the terms of the purchase and exchange agreement, Cobalt issued $500.0 million of the first lien notes for cash at a price of 98 percent of par and issued approximately $584.7 million of the second lien notes and 30.0 million shares of common stock in exchange for: (a) $616.6 million aggregate principal amount of the 2.625% unsecured notes, and (b) $95.9 million aggregate principal amount of the 3.125% unsecured notes. Overall, the exchange increased Cobalt's liquidity by $490.0 million and decreased the principal amount of outstanding notes with a 2019 maturity by nearly half.

2.      **2017 Debt Exchanges**

During the first half of 2017, Cobalt effectuated three additional debt exchanges.  On January 30, 2017, Cobalt issued approximately $139.2 million of additional second lien notes in exchange for: (a) $137.8 million of the 2.625% unsecured notes, and (b) $60.0 million of the 3.125% unsecured notes. On April 24, 2017, Cobalt issued approximately $178.6 million of additional second lien notes in exchange for:  (a) $6.4 million of the 2.625% unsecured notes, and (b) $296.3 million of the 3.125% unsecured notes.  On May 18, 2017, Cobalt issued approximately $32.1 million of additional second lien notes in exchange for $60.9 million of the 3.125% unsecured notes.

Collectively, the three 2017 transactions completely utilized the availability under the first lien notes indenture and the second lien notes indenture to issue additional second lien notes.  The debt exchanges collectively resulted in an aggregate reduction in principal face amount outstanding under Cobalt's long-term indebtedness by approximately $339.2 million and pushed out a significant amount of Cobalt's maturities from 2019 to 2023.

E.      **2017 Interest Payments**

For all the reasons discussed herein, despite Cobalt's thoughtful attention to judiciously spending capital in order to maximize liquidity and value, its liquidity position nevertheless deteriorated. Considering its diminishing liquidity position, Cobalt critically analyzed and considered the implications of making the $12.3 million interest payment due on November 15, 2017 under the 3.125% unsecured notes indenture.  Cobalt's board of directors (the "Board"), in consultation with its advisors, carefully balanced the Company's need for short term liquidity with Cobalt's long-term prospects, and ultimately decided to defer making the November 2017 interest payment and entered into the 30-day grace period.

Shortly thereafter, the Board once again reviewed the Debtors' liquidity position as it examined the upcoming interest payments due on December 1, 2017 under the first lien indenture, the second lien indenture, and the 2.625% unsecured notes indenture.  The Board, in consultation with its advisors, decided to pay the interest payments due under the first lien indenture and second lien indenture, but deferred making the $8.1 million interest payment due under the 2.625% unsecured notes indenture. Cobalt's decision to forgo the November 2017 interest payment and the December 2017 2.625% unsecured notes interest payment preserved liquidity.

F.      **Committee Investigation Regarding Prepetition Debt Transactions**

The Committee is investigating (i) the validity, enforceability, priority and the extent of the Debtors' prepetition secured obligations and (ii) potential Causes of Action held by the Estates that may be asserted against the Debtors' prepetition secured lenders, including with respect to the foregoing debt exchanges and financing transactions. The Committee is reviewing documents and other information provided by the Debtors both on an informal basis and in response to formal discovery in order to obtain the information necessary to complete its investigation before March 21, 2018, which is the deadline under the Cash Collateral Order for the Committee to commence an adversary proceeding to (i) challenge the First Lien Note Claims and the Second Lien Note Claims, and (ii) assert Causes of Action against the First Lien Noteholders and Second Lien Noteholders (the "Investigation Termination Date"), in each case as and to the extent set forth in the Cash Collateral Order.

The Debtors have conducted their own investigation regarding the perfection, validity, enforceability, priority and extent of their prepetition secured obligations and potential Causes of Action held by the Estates that may be asserted against their prepetition secured lenders (and their respective agents, members, advisors, counsel and other representatives), including with respect to the debt exchanges, financing transactions, and other matters relating in any way to the prepetition secured loan

documents and the obligations thereunder.  The process and conclusions of such investigation are described in Article VIII.H hereof.  In short, the Debtors do not believe that such potential claims and Causes of Action have any merit and even if they did, the costs of pursuing such claims and Causes of Action could deplete stakeholder recoveries.

The Cash Collateral Order provides that any admission, acknowledgment, agreement, or stipulation in respect of such obligations and granting of releases constitutes a compromise between the Debtors and their prepetition secured lenders, and such provisions shall be ineffective unless and until the Court approves such compromise by further order.  A hearing on the compromising is scheduled for March 22, 2018, at 9:30 a.m.

The Debtors' stipulations, admissions and releases likewise are not immediately binding on the Committee. The Committee, or another party in interest, with proper standing (which has been granted by order of the Court or another court of competent jurisdiction) may challenge the validity, enforceability, priority or extent of the First Lien Notes and the Second Lien Notes, or otherwise file a Cause of Action against the First Lien Noteholders and Second Lien Noteholders, provided that the Committee timely files an adversary proceeding by March 21, 2018 (provided, such date shall be tolled if the Committee files a motion seeking standing to make a challenge on or prior to March 21, 2018.) However, if no such adversary proceeding is commenced by March 21, 2018 or the Investigation Termination Date is not tolled, the releases, admissions and stipulations in the Cash Collateral Order will be binding on the Committee and all parties in interest at that time. The Committee's investigation of these matters is ongoing.

## VIII.   EVENTS OF THE CHAPTER 11 CASES

### A.      First/Second Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees and vendors following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of David D. Powell, Chief Financial Officer of Cobalt International Energy, Inc. In Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 16], filed on December 14, 2017.

On January 11, 2018, the Debtors held their second day hearing before the Bankruptcy Court.  At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including authority to continue to pay employee wages and benefits [Docket No. 195], insurance premiums [Docket No. 199], and taxes in the ordinary course of business [Docket No. 198].  In addition, the Bankruptcy Court entered a second interim order with regard to the Debtors' cash management motion [Docket No. 197].  A final hearing with respect to the Debtors' cash management motion shall be set at a later date.  The Bankruptcy Court also granted orders establishing procedures for interim compensation and reimbursement of expenses for retained professionals [Docket No. 204] and procedures regarding the transfer of the Debtors' common stock [Docket No. 196].  Lastly, the Bankruptcy Court granted the Debtors' application to employ and retain KCC as the Claims, Noticing, and Solicitation Agent [Docket No. 203].

The Debtors continued the final hearing with respect to the Debtors' cash collateral motion, Sonongal settlement motion, sales incentive plan motion, severance motion, bidding procedures motion, and motion to pay certain oil and gas expenditures to January 25 and 26, 2018, or such other date and time as may be set by the Bankruptcy Court.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/cobalt.

**B.      Other Procedural and Administrative Motions**

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professional Motion.  On January 12, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 214] (the "OCP Motion").  The OCP Motion seeks to establish procedures for the retention and compensation of certain professional utilized by the Debtors in the ordinary course operation of their businesses.

- Retention Applications.  On December 21, 2017, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP [Docket No. 121] and Zack A. Clement PLLC [Docket No. 122] as the Debtors' legal counsel, and Houlihan Lokey Capital, Inc. as the Debtors' financial advisor and investment banker to the Debtors [Docket No. 124], which applications were all approved by the Bankruptcy Court on January 11, 2018.  Between January 9 and 13, 2018, the Debtors filed a number of additional retention applications, including an application to retain Baker Botts L.L.P. [Docket No. 181] as the Debtors' special litigation counsel, an application to retain Ernst & Young LLP [Docket No. 215] as auditor for the Debtors, and an application to retain Susman Godfrey LLP as the Debtors' special litigation counsel [Docket No. 217], which applications were all approved by the Bankruptcy Court on February 8, 2018.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Case.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

**C.      Litigation Matters**

In the ordinary course of business, the Debtors are parties to certain legal proceedings.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the confirmation of a plan under chapter 11, with certain exceptions.  Therefore certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

On the Petition Date, the Debtors commenced an adversary proceeding  (the "Adversary Proceeding") seeking to extend the automatic stay to non-Debtor parties in the Securities Action in the United States District Court for the Southern District of Texas (Case No. 4:14-cv-03428).  On the Petition Date, the Debtors also filed the *Debtors' Motion to Stay or, In The Alternative, for Injunctive Relief Enjoining, Prosecution of Certain Pending Litigation Against Non-Debtor Defendants and Memorandum of Law in Support Thereof* (the "Stay Motion") [Adversary Proceeding Docket No. 2].  On January 4, 2018, the Court held a hearing on the Debtors' Stay Motion and issued an order holding that the automatic stay would remain in full force and effect through 11:59 p.m. (prevailing Central Time) on

April 20, 2018 even if the Debtors are dismissed from the Securities Action [Adversary Proceeding Docket No. 58].

### D.    Schedules and Statements

On January 29, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs.

### E.    Appointment of Official Committee

On December 21, 2017, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 117], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  Wells Fargo Bank, National Association; Baker Hughes, a GE Company; and Schlumberger Technology Corporation.   The Committee has retained Pachulski Stang Ziehl & Jones LLP and Snow Spence Green LLP as its legal counsel and Conway MacKenzie, Inc. as its financial advisor.

### F.    Sales Incentive Plan

To incentivize their senior management team to deliver maximum value for the Debtors' stakeholders, on November 13, 2017, the Debtors' Board of directors adopted a sales incentive plan (the "Sales Incentive Plan").  Pursuant to the Sales Incentive Plan, the Debtors' senior management is eligible to share in a multi-tiered bonus pool that increases in value based on the total enterprise value of a Sale Transaction.  On December 21, 2017, the Debtors filed a motion to approve the Sales Incentive Plan [Docket No. 136].   Following negotiations with the Committee and the Unsecured Notes Ad Hoc Committee, the Debtors agreed to, among other things, increased the Threshold (as defined in the Sales Incentive Plan) from $1.25 billion to $1.5 billion.  On January 26, 2018, the Court approved the Sales Incentive Plan [Docket No. 307].

### G.    Sonangol Settlement

In August 2015, Cobalt's non-Debtor subsidiary that holds the Angola assets entered into an agreement to sell those assets to Sonangol for $1.75 billion. Through the proposed Angola sale, Cobalt hoped to de-risk its balance sheet and focus its business efforts on its core Gulf of Mexico assets. Sonangol paid an initial deposit of $250 million but failed to obtain Angolan government approvals required to close the deal, and, as a result, the purchase and sale agreement automatically terminated in August 2016.  Cobalt (through non-Debtor subsidiaries) subsequently commenced arbitration regarding the transaction and Sonangol's breach of contract. In addition, CIE Angola Block 21 Ltd., another non-Debtor subsidiary, commenced a parallel arbitration against Sonangol P&P for non-payment of past costs owed to Cobalt for operations related to the Angola assets.

Cobalt engaged with Sonangol regarding a potential resolution of the parties' disputes for many months of active negotiations.  Following recent political changes in Angola (including the election of the first new president of the country in over 30 years) and a resulting leadership change at Sonangol, these settlement discussions took on a renewed focus and culminated, on December 19, 2017, with Cobalt and Sonangol successfully reaching agreement on a global settlement (subject to Bankruptcy Court approval).

The key terms of the settlement include:

- $500 million payment by Sonangol to Cobalt, payable in two installments ($150 million paid by February 23, 2018, and the balance of $350 million paid by July 1, 2018);

- the resolution of Cobalt's two International Chamber of Commerce ("ICC") arbitrations seated in the United Kingdom and Switzerland (and avoidance or mitigation of potentially substantial costs of continued arbitration);

- a full release of all disputes, debts, and obligations between the parties (including Sonangol's release of any claim to the $250 million deposit paid in connection with the contemplated sale, which deposit is incremental to the $500 million to be paid by Sonangol to Cobalt); and

- the transition of ownership of Cobalt's Angola assets to Sonangol.

On December 21, 2017, the Debtors filed a motion seeking to approve the Sonangol settlement [Docket No. 127].  On January 18, 2018, Sonangol and Sonangol P&P filed a limited objection to the Debtors' motion [Docket No. 234] seeking to clarify the numerous prerequisites that must be met before the settlement agreement could be fully realized, including, among others, approval by the Ministry of Petroleum of the Republic of Angola.  On January 24, 2018, the Court entered an order approving the Debtors' entry into the Sonangol settlement [Docket No. 300].

### H.     Investigation

Beginning prepetition and continuing postpetition, independent and disinterested Board members investigated certain potential claims and causes of action held by the Debtors' Estates, including (1) potential claims regarding the 2016 and 2017 debt exchange transactions; (2) potential claims regarding the Debtors' Angolan operations alleged in the three shareholder derivative actions *Gaines v. Bryant*, No. 2016-29850, District Court 295, Harris County, Texas, May 2016; *McDonaugh v. Bryant*, No. 2016-82186, District Court 80, Harris County, Texas, November 2016; and *Hafkey v. Bryant*, No. 2017-23329, District Court 295, Harris County, Texas, April 2017; and (3) certain other fiduciary-duty claims that the Committee  has suggested it may seek to pursue.

In connection with the investigation, Kirkland & Ellis LLP, at the direction of the independent and disinterested directors, reviewed over 13,500 documents, including, but not limited to:  transaction agreements, closing books, and related documents; Board and Board committee minutes, pre-reads, and presentations; financial statements and projections; Debtor and third-party memoranda, evaluations, opinions, and valuations relating to the matters being investigated, including reports by Vinson & Elkins LLP and O'Melveny & Myers LLP, Control Risks Group, and Navigant; the *Gaines*, *McDonough*, and *Hafkey* demands and related correspondence, petitions, special exceptions, and related briefing and rulings; the Report of the Special Litigation Committee to the Board regarding the *Gaines* and *McDonough* demands; certain documents produced to and correspondence with the SEC and the United States Department of Justice; the results of targeted email searches; pleadings, briefing, orders, and certain discovery in *In re Cobalt International Energy, Inc. Securities Litigation* (Lead Case No. 4:14-cv-3248, S.D. Tex.), including deposition testimony; formation and governance documents for Cobalt; certain of the Debtors' contracts; and other publicly available materials.  In addition, Kirkland & Ellis LLP conducted interviews, including of Chief Executive Officer Timothy J. Cutt, Chief Financial Officer David D. Powell, and Senior Vice President of Strategy and Business Development Richard A. Smith.

The independent and disinterested directors have voted that it is not in the best interest of the Debtors or their Estates to pursue the claims that it investigated.  Among other reasons, the independent and disinterested directors determined that even if there were merit to these potential claims—and, in the independent and disinterested directors' views, there is not—the cost to the Debtors' Estates to pursue these claims, and the potential recoveries available to unsecured creditors if successful, do not and cannot support pursuing those claims.

Kirkland & Ellis LLP conferred with the independent and disinterested directors of the Board about the investigation on multiple occasions. After completing its work concerning those potential claims, Kirkland & Ellis LLP presented the results of the investigation and bases therefor three times to the independent and disinterested directors before the independent and disinterested directors voted regarding those claims. In particular, the independent and disinterested directors voted: (i) to reapprove the compromise the Debtors reached with their prepetition secured lenders, as reflected in the Cash Collateral Order, to release potential constructive or intentional fraudulent transfer claims concerning the debt exchange transactions; (ii) to deny the Committee's February 7, 2018 letter demanding standing to pursue derivative claims against former officers, current and former directors, and equity sponsors; and (iii) to release certain other potential fiduciary-breach claims against current and former directors that the Committee has suggested it may seek standing to pursue.

In addition, the Debtors reviewed the liens and security interests granted to the prepetition secured lenders and concluded that there was no reason to doubt that such liens and security interests had been properly perfected.

After the independent and disinterested directors voted, Kirkland & Ellis LLP presented to the entire Board the disinterested directors' conclusions, and Kirkland & Ellis LLP's assessments regarding the lien perfection analysis. The full Board then (i) voted to approve the Plan; (ii) reaffirmed its judgment regarding the reasonableness of the compromise with the Debtors' prepetition secured lenders set forth in the Cash Collateral Order; and (iii) authorized and directed the Debtors to take any further action as necessary to effectuate these decisions.

Kirkland & Ellis LLP has also engaged constructively with the Committee to facilitate its investigation, providing the Committee with documents relied on in the investigation, as well as those requested pursuant to the Committee's 88 Requests for Production, made pursuant to Bankruptcy Rule 2004. In particular, by February 16, 2018, the Debtors produced 6,779 documents totaling 54,434 pages that they had collected, plus another 37,244 documents (326,446 pages) of discovery from *In re Cobalt International Energy, Inc. Securities Litigation*.

The Debtors reserve the right to investigate other potential claims that the Committee or others may request that the Debtors consider, or if new information becomes available to the Debtors concerning potential claims of the Estates, whether or not previously investigated. Likewise, the Debtors reserve the right to amend the release provisions in the Plan, and reserve all rights, including in the event new information becomes available.

## I.     Expected Timetable of the Chapter 11 Cases and the Marketing Process

As described above, the Debtors intend to move as quickly as practicable during the Chapter 11 Cases. Accordingly, on the Petition Date, the Debtors filed the Bid Procedures Motion, which, among other things, established dates and deadlines for the bidding procedures hearing, bid deadline, auction, and sale hearing.

Beginning in early 2017, the Debtors and their advisors contacted potential buyers, executed nondisclosure agreements, and received indications of interest from certain bidders.

Pursuant to the order approving the Bid Procedures Motion, 5:00 p.m. (prevailing Central Time) on February 22, 2018 is the final bid deadline for all Sale Transactions and an Auction, if needed, will be held at 10:00 a.m. (prevailing Central Time) on March 6, 2018.

## IX.     RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1.     Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.     The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3.     The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interest and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.     The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code gave the Debtors the exclusive right to propose a chapter 11 plan and prohibited creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose and solicit votes on the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the

Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**7.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**8.      The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**9.      Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**10.      Risks related to the Cobalt's Settlement with Sonangol**

As described above, in December 2017, the Debtors entered into a global settlement agreement with Sonangol which contemplates, among other things, certain payments by Sonangol to Cobalt, the transfer of ownership of Cobalt's Angola assets to Sonangol, and the resolution of Cobalt's arbitrations against Sonangol before the ICC. The settlement remains subject to a number of prerequisites including, among others, the approval by the Ministry of Petroleum of the Republic of Angola. Although the Debtors believe that both parties will work diligently to consummate the settlement agreement, the parties may not be able to satisfy the necessary prerequisites or obtain the appropriate governmental approvals in order to consummate the settlement. If the settlement is not consummated, the Debtors will resume the arbitration proceedings against Sonangol and Sonangol P&P. Failure to consummate the settlement may have a material impact on recoveries under the Plan and the Debtors' business operations.

**11.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan,

will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Debtors may not be able to obtain Confirmation of the Plan.

### 13. Risked related to reinstatement pursuant to section 1124(2) of the Bankruptcy Code

The Debtors intend to reinstate Class 3 and Class 4 pursuant to section 1124(2) of the Bankruptcy Code and satisfy the First Lien Notes and the Second Lien Notes in accordance with the terms of the First Lien Indenture and the Second Lien Indenture, as applicable, subject to a consensual resolution of such Claims. Reinstatement, or the failure to reinstate, the First Lien Notes Claims or the Second Lien Notes Claims in accordance with section 1124(2) of the Bankruptcy Code could materially affect distributions available to holders of Allowed Claims under the Plan.

### 14. Risks related to any "make whole" premium payable pursuant to the First Lien Indenture or the Second Lien Indenture

The First Lien Indenture and the Second Lien Indenture each set forth a so-called "make whole" provision which, if enforceable, could result in an obligation to pay a premium pursuant to the First Lien Indenture or the Second Lien Indenture. The Debtors anticipate that the amount of any "make whole" premium could be subject to negotiation and/or litigation between the Debtors and/or parties in interest. Accordingly, liability on account of any such "make-whole" premium could materially affect distributions available to holders of Allowed Claims under the Plan.

### 15. The Total Amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims May Be Higher than Anticipated by the Debtors

With respect to holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated. As holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims receive a Pro Rata distribution, additional claims could reduce the recovery.

16.     **Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article X of this Disclosure Statement entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how tax implications of the Plan and the Chapter 11 Cases may adversely affect the holders of Claims.

B.     **Risks Related to the Debtors' Businesses**

1.     **The Debtors May Not Be Able to Generate or Obtain Sufficient Cash to Service All of Their Indebtedness**

The Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to generate sufficient cash flows from operations or to obtain alternative sources of financing in an amount sufficient to fund the Debtors liquidity needs.  The Debtors' operating cash inflows are typically used for capital expenditures, operating expenses, debt service costs, and working capital needs.

2.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.   These risks include:   (a) ability to develop, confirm, and consummate the Sale Transaction specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationship with suppliers, vendors, service providers, contract counterparties, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interest in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, contract counterparties, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.     **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a

significant amount of time and effort dealing with the Sale Transaction instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses. In addition, the longer the proceedings related the Chapter 11 Cases continue, the more likely it is that suppliers and potential purchasers will lose confidence in the Debtors' ability to sell their businesses and may seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. As of the date hereof, the chapter 11 proceedings are being funded through a consensual cash collateral agreement with the Debtors' lenders. If the Chapter 11 Cases continue for a prolonged period of time, it may be necessary for the Debtors to seek debtor-in-possession financing to fund their operations. If the Debtors are forced to seek debtor-in-possession financing, the likelihood that the Debtors will instead be required to liquidate may be increased, and, as a result, creditor recoveries may be significantly impaired.

**4.      The Debtors' Substantial Liquidity Needs May Impact Revenue**

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been borrowings under various bank-funded facilities, issuances of bonds, issuances of equity securities, asset sales, and cash flow from operations. Offshore drilling requires a higher initial capital expenditure than onshore projects generally, but correspondingly can have a comparable return on investment over a longer relative period of time. If the Debtors' operating expenditures continue to vastly exceed revenues, however, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur additional costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

44

5.      **Under the Terms of the Debtors' Various License Agreements, the Debtors Are Required to Drill Wells and Conduct Certain Development Activities in Order to Retain Exploration and Production Rights**

In order to protect their exploration and production rights in their license areas, the Debtors must meet various drilling and declaration requirements.  In general, unless the Debtors make and declare discoveries within certain time periods specified in the applicable license agreements and leases, the interests in the undeveloped parts of the Debtors' license (as is the case in Angola and Gabon) or the whole block (as is the case in the deepwater Gulf of Mexico) may lapse and the Debtors may be subject to significant penalties or be required to make additional payments in order to maintain such licenses.

In addition, most of the Debtors' deepwater Gulf of Mexico blocks have a 10 year primary term, expiring between 2017 and 2025.  Generally, the Debtors are required to commence exploration activities or successfully exploit the properties during the primary lease term in order for these leases to extend beyond the primary lease term.  A portion of the leases covering the Debtors' North Platte, Shenandoah and Anchor discoveries are beyond their primary term, and the operator must conduct continuous operations or obtain a SOP in order to maintain such leases.  In addition, certain of the Debtors' targeted exploration prospects have leases that expire within the next 12 months and even if the Debtors were to commence exploration activities prior to lease expiration, the Debtors could be required to conduct continuous operations on those prospects if the initial exploration activities were to be successful.  This requirement to conduct continuous drilling operations may cause the Debtors to relinquish such leases despite the fact that an exploration well on such leases was successful.  Accordingly, the Debtors and their partners may not be able to drill all of the prospects identified on the leases or licenses prior to the expiration of their respective terms.  Failure to maintain the Debtors' leases could materially adversely affect the Debtors' businesses, results of operations, financial condition, and recoveries under the Plan.

6.      **Offshore Drilling Is a High Risk Activity with Many Uncertainties that Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' operations are subject to many risks, including the risk that the Debtors will not discover commercially productive reservoirs.  Drilling for oil and natural gas can be unprofitable, not only from dry holes, but from productive wells that do not produce sufficient revenue to return a profit.  The Debtors' decisions to purchase, explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, as well as production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.  In addition, the results of the Debtors' exploratory drilling in new or emerging areas are more uncertain than drilling results in areas that are developed and have established production, and the Debtors' operations may involve the use of recently-developed drilling and completion techniques.  The Debtors' cost of drilling, completing, equipping, and operating wells is often uncertain before drilling commences.  Declines in commodity prices and overruns in budgeted expenditures are common risks that can make a particular project uneconomic or less economic than forecasted.  Further, many factors may curtail, delay, or cancel drilling and completion projects, including the following:

- delays or restrictions imposed by or resulting from compliance with regulatory and contractual requirements;

- delays in receiving governmental permits, orders, or approvals;

- differing pressure than anticipated or irregularities in geological formations;

- equipment failures or accidents;

- adverse weather conditions;

- loss of title or other title related issues; and

- shortages or delays in the availability of, increases in the cost of, or increased competition for, drilling rigs and crews and equipment, pipe, chemicals, and supplies.

The occurrence of certain of these events, particularly equipment failures or accidents, could impact third parties, including the Debtors' employees and employees of the Debtors' contractors, leading to possible injuries, death, or significant property damage.  As a result, the Debtors face the possibility of liabilities from these events that could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

        **7.**       **The Debtors' Business Is Subject to Complex Laws and Regulations that Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to extensive laws and regulations, including complex environmental laws and occupational health and safety laws, particularly in respect to the following matters:

- licenses and lease for drilling operations;

- foreign exchange and banking;

- royalty increases, including retroactive claims;

- drilling and development bonds and social payment obligations;

- reporting concerning operations;

- the spacing of wells;

- unitization of oil accumulations;

- environmental remediation or investigation; and

- taxation.

Under these and other laws and regulations, the Debtors could be liable for personal injuries, property damage, and other types of damages for which the Debtors may not maintain, or otherwise be protected by, insurance coverage. In the event of environmental violations, the Debtors may be charged with remedial costs and third party claims.  Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage, regardless of negligence or fault.  In addition, pollution and similar environmental risks generally are not fully insurable.  The Debtors' operations create the risk of environmental liabilities to governments or third parties.  Failure to comply with these laws and regulations also may result in the suspension or termination of the Debtors' operations and subject the Debtors to administrative, civil, and criminal penalties.  Moreover, these laws and regulations could change in ways that could substantially increase our costs.  Any such liabilities, penalties, suspensions, terminations, or regulatory changes could have a material adverse effect on the Debtors' business, financial condition, results of operations, and cash flows and could potentially effect recoveries under the Plan.

8. **The Debtors' Operations Are Subject to Hazards Inherent in the Offshore Exploration and Production of Oil and Natural Gas**

Risks inherent in the offshore drilling industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages, and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability, and relationships with customers, employees and regulators.

Furthermore, the marketability of expected production from the Debtors' prospects will also be affected by numerous factors. These factors include market fluctuations of oil and natural gas prices, proximity, capacity and availability of pipelines, the availability of processing facilities, equipment availability and government regulations (including, without limitation, regulations relating to prices, taxes, royalties, allowable production, importing and exporting of hydrocarbons, environmental, safety, health and climate change). The effect of these factors, individually or jointly, may have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Debtors and could potentially effect recoveries under the Plan.

In addition, offshore operations are subject to a variety of operating risks specific to the marine environment, such as capsizing, collisions and damage or loss from hurricanes or other adverse weather conditions. These conditions can cause substantial damage to facilities and interrupt the Debtors' operations. As a result, the Debtors could incur substantial expenses that could reduce or eliminate capital and funds available for exploration, development or leasehold acquisitions, or result in loss of equipment and properties.

Deepwater exploration generally involves greater operational and financial risks than onshore exploration or exploration in shallow waters. Deepwater drilling generally requires more time and more advanced drilling technologies, involving a higher risk of technological failure and usually higher drilling costs. In addition, deepwater operations in the U.S. Gulf of Mexico generally lack the physical and oilfield service infrastructure present in shallower waters. As a result, a significant amount of time may elapse between a deepwater discovery and the marketing of the associated hydrocarbons, increasing both the financial and operational risk involved with these operations. Because of the lack and high cost of this infrastructure, oil and natural gas discoveries in the deepwater may never be economically producible.

In addition, in the event of a well control incident, containment and, potentially, cleanup activities for offshore drilling are costly. The resulting regulatory costs or penalties, and the results of third party lawsuits, as well as associated legal and support expenses, including costs to address negative publicity, could well exceed the actual costs of containment and cleanup. As a result, a well control incident could result in substantial liabilities for the Debtors, and have material adverse effect on the Debtors' business, financial condition, results of operations, and cash flows and could potentially effect recoveries under the Plan.

9. **The Geographic Concentration of the Debtors' Operations Subjects Them to an Increased Risk from Factors Affecting Those Areas**

The Debtors' operations are concentrated in the deepwater U.S. Gulf of Mexico and offshore West Africa. Some or all of these properties could be affected should such regions experience:

- severe weather or natural disasters;

- moratoria on drilling or permitting delays;

- delays in or the inability to obtain regulatory approvals;

- delays or decreases in production;

- delays or decreases in the availability of drilling rigs and related equipment, facilities, personnel or services;

- delays or decreases in the availability of capacity to transport, gather or process production; and/or

- changes in the regulatory, political and fiscal environment.

Due to the concentrated nature of the Debtors' portfolio of properties, a number of properties could experience any of the same conditions at the same time, resulting in a significant impact on the Debtors' results of operations.

### 10.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.

## X.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### 1.    Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the sale of the Debtors' businesses.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### 2.        Best Interests of Creditors—Liquidation Analysis

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transactions.  Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims than would a chapter 7 liquidation.  Liquidating the Debtors' Estates under the Plan likely provides holders of Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  Such amounts, together with other wind-down costs, would likely exceed the amount of costs that the Plan Administrator and its professionals and agents would be expected to incur in connection with completing the liquidation of the Estates.

Additionally, the Estates would likely suffer additional delays, as a chapter 7 trustee and his/her counsel needs time to complete the necessary learning curve in order to complete the administration of the Estates.  The conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

**B.      Alternative Plans**

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates.  The Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

**C.      Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to Confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of claims.  Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan.  Only holders of Claims in the Voting Class will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.  No Class including holders of Interests is entitled to vote on the Plan.

**D.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the plan have not accepted it or if an Impaired Class is deemed to reject the Plan; provided that the plan is accepted by at least one Impaired Class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

**1.      No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent,

50

but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (e.g., classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

## 2.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because, for each applicable Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

### i.      Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

### ii.      Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

### iii.      Equity Interests

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## XI.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders (each a "Holder," and as defined

51

below) of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY, ONLY**

ADDRESSES CERTAIN CONSIDERATIONS WITH RESPECT TO THE U.S. TAX TREATMENT OF THE DEBTORS AND U.S. HOLDERS, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

### B.    Certain United States Federal Income Tax Consequences to the Debtors

The Debtors anticipate that the Sale Transactions may give rise to significant taxable income if they are structured as a sale of the Debtors' assets.  Although the Debtors currently believe that they have sufficient tax attributes, including net operating losses ("NOLs"), to avoid having a material cash liability for federal income taxes, that cannot be guaranteed and will depend, in significant part, on the sale price of the Debtors' assets in any Sale Transaction, the tax treatment of the settlement with Sonangol, whether the Debtors have undergone (or subsequently undergo) an "ownership change" under Section 382 of the IRC prior to the consummation of the Sale Transactions, and other factors.  To the extent any cash federal income tax liability arises in connection with the Sale Transactions, recoveries to Holders of Claims could be reduced.

Under the IRC, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income.  In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. In this case, the Debtors expect that they may recognize significant CODI from the implementation of the Plan, regardless of how the Sale Transactions are structured, and this CODI would result in a reduction in the Debtors' tax attributes.  Because the total amount of CODI cannot be determined with certainty until the Plan is implemented, the Debtors are not able to project the extent to which their tax attributes would survive CODI recognized as a result of the implementation of the Plan.  In the event the Sale Transactions are structured as a sale of the Debtors' assets and the Debtors liquidate following the consummation of such transactions, any remaining tax attributes would be eliminated as a result of such liquidation.  In the event the Sale Transactions are structured as an acquisition of the stock of CIE, then any remaining tax attributes would be subject to significant limitation under Section 382 of the IRC, particularly because it is highly unlikely that Section 382(l)(5) would be applicable in connection with any acquisition of CIE's stock pursuant to a Sale Transaction.

### C.    Certain United States Federal Income Tax Consequences to U.S. Holders of Allowed Claims

#### 1.    Consequences to Holders of Allowed Other Priority Claims, Other Secured Claims, First Lien Notes Claims, Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims

Pursuant to the Plan, in full satisfaction of their claims, Holders of Allowed Other Priority Claims, Other Secured Claims and Allowed First Lien Notes Claims will exchange such Claims for payment in full or receive such other treatment under the Plan as to render such Claims Unimpaired in accordance with section 1124 of the Bankruptcy Code, as applicable, and Holders of Allowed Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General

Unsecured Claims will exchange such Claims for their Pro Rata share of Cash from the Plan Administrator Assets available to satisfy such Claims in accordance with their relative priority.

A U.S. Holder of Allowed Other Priority Claims, Other Secured Claims, First Lien Notes Claims, and Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims that receives Cash will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

In the event any Claim is reinstated under the Plan, the Debtors do not anticipate that such reinstatement would result in any material U.S. federal income tax consequences; payments made pursuant to such Claim going forward would be subject to the tax treatment that applied to payments on such debt instrument prior to the commencement of the chapter 11 proceedings.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 2.  Accrued Interest and OID

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest or original issue discount ("OID") on such Claims. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

### 3.  Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market

discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 4.    Matters Related to the Disputed Claims Reserve

The Debtors intend to create a Disputed Claims Reserve to hold the Disputed Claims Reserve Amount. The Debtors intend to (i) treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. In general, property that is subject to disputed ownership fund treatment is subject to taxation within the fund (either at C-corporation or trust rates, depending on the nature of the assets held by the fund). Unlike a grantor trust, items of taxable income, gain, loss, and deduction do not flow up from such fund to the parties that may be entitled to assert a claim against such fund. Under disputed ownership fund treatment, a separate federal income tax return shall be filed with the IRS for the Disputed Claims Reserve with respect to any income attributable to the account, and any taxes imposed on the Disputed Claims Reserve or its assets shall be paid out of the assets of the Disputed Claims Reserve.

Although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the Disputed Claims Reserve Amount is transferred by the Debtors to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the Disputed Claims Reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.

To the extent that a U.S. Holder of a Disputed Claim receives distributions of cash with respect to such Claim subsequent to the Effective Date, such Holder may recognize additional gain (if such Holder is in a gain position) and a portion of such cash may be treated as imputed interest income. In addition, it is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of the Disputed Claims Reserve to all Holders of Disputed Claims. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the IRC), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

    **D.**    **Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims**

        **1.**    **Consequences to Non-U.S. Holders of Allowed Other Priority Claims, Other Secured Claims, First Lien Notes Claims, Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims**

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

        **i.**    **Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) any gain is subject to taxation under FIRPTA (as defined and discussed below).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

        **ii.**    **Accrued Interest**

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

    (a)    the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote;

    (b)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the Tax Code);

     (c)     the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

     (d)     such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### iii.    FIRPTA

Non-U.S. Holders and, in particular, holders of the Debtors' convertible debt instruments, should discuss the potential substantive taxation and withholding implications of the Plan in connection with the Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA"), with their own tax advisors. Although not free from doubt, in light of the status of the Debtors' non-Gulf of Mexico Assets, it is likely that Cobalt is currently a U.S. real property holding company ("USRPHC") under FIRPTA. The Debtors have not yet made any determinations with respect to whether FIRPTA withholding will be necessary in connection with distributions to any Non-U.S. Holders of Claims, and the question of whether recoveries under the Plan may be subject to substantive taxation under FIRPTA is not free from doubt with respect to certain categories of Claims. In the event FIRPTA withholding is ultimately determined to be necessary, a Non-U.S. Holder may be entitled to a refund of amounts withheld depending upon such Non-U.S. Holder's tax basis in its Claim, the amount of any distribution to such Non-U.S. Holder, and whether substantive FIRPTA taxation in fact applies to recoveries under the Plan.

U.S. Holders may be required to supply certain non-foreign withholding certificates to avoid FIRPTA withholding in the event the Debtors conclude that FIRPTA withholding is necessary with respect to any particular category of Claims.

### iv.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

### E.  Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the  form of a properly executed IRS Form W-9  for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Debtors, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  February 19, 2018

Respectfully submitted,

Cobalt International Energy, Inc.,
on behalf of itself and each of the other Debtors

By:    */s/ David D. Powell*
Name: David D. Powell
Title:   Chief Financial Officer

**<u>Exhibit A</u>**

**Chapter 11 Plan**

**<u>Exhibit B</u>**

**Information to be included in the Disclosure Statement Supplement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) Case No. 17-36709 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### <u>INFORMATION TO BE INCLUDED IN THE DISCLOSURE STATEMENT SUPPLEMENT</u>

On or before March 9, 2018, or as soon after the conclusion of the auction as reasonably practicable, the Debtors will distribute a supplement to the Disclosure Statement that provides the following information:

- A description of the bids received and/or the successful bids following the auction.

- The following chart estimating creditor recoveries by Class.

- The liquidation analysis comparing creditor recoveries under the Plan to those in a hypothetical chapter 7 liquidation.

- Any other information that the Debtors deem material to creditor recoveries or confirmation of the Plan.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| 1 | Other Priority Claims | Each holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Allowed Other Priority Claim and the Debtors; *provided* that to the extent an Allowed Other Priority Claim has not been satisfied during the Chapter 11 Cases, no Cash payment shall be made on such Allowed Other Priority Claim | $0 | [●]% |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable. | | |
| 2 | Other Secured Claims | Each holder shall receive either (i) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $0 | [●]% |
| 3 | First Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Claim, each holder of an Allowed First Lien Notes Claim shall receive treatment rendering its Allowed First Lien Notes Claims Unimpaired under applicable provisions of the Bankruptcy Code. | $500,000,000 in principal amount | [●]% |
| 4 | Second Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Claim, each holder of an Allowed Second Lien Notes Claim shall receive either (i) its Pro Rata share of the Second Lien Recovery or (ii) in the Debtors' sole discretion, and solely in the event the Debtors' have sufficient Cash (including proceeds of a Sale Transaction) to provide for such treatment, such other treatment rendering its Allowed Second Lien Notes Claim Unimpaired under applicable provisions of the Bankruptcy Code. | $934,732,000 in principal amount | [●]% |

| **SUMMARY OF EXPECTED RECOVERIES** |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|-------|----------------------|-----------------------------------|---------------------------|-----------------------------------|
| 5 | Subsidiary General Unsecured Claims | Each holder of an Allowed Subsidiary General Unsecured Claim shall receive its Pro Rata share of the Subsidiary General Unsecured Claim Recovery up to payment in full of such holder's Allowed Subsidiary General Unsecured Claim. | $[●] | [●]% |
| 6 | Cobalt General Unsecured Claims | Each holder of an Allowed Cobalt General Unsecured Claim shall receive its Pro Rata share of the Cobalt General Unsecured Claim Recovery up to payment in full of such holder's Allowed Subsidiary General Unsecured Claim. | $[●] | [●]% |
| 7 | Section 510(b) Claims | Each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. | $0 | [●]% |
| 8 | Intercompany Claims | Intercompany Claims may be, at the option of the Debtors, either: (i) Reinstated as of the Effective Date or (ii) cancelled; *provided* that no distribution shall be made on account of such Claims, and any Reinstatement will be solely to determine the right or entitlement of other holders of Claims to recoveries. | N/A | [●]% |
| 9 | Intercompany Interests | Intercompany Interests may be, at the option of the Debtors, either: (i) Reinstated as of the Effective Date or (ii) cancelled, and no distribution shall be made on account of such Interests. | N/A | [●]% |
| 10 | Interests in Cobalt | Existing Interests in Cobalt shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in Cobalt on account of such Interests. | $0 | [●]% |