# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| **COBALT INTERNATIONAL ENERGY, INC.** *et al.,*[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE
ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE
SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO
CONFIRMATION OF THE DEBTORS' PROPOSED JOINT CHAPTER 11 PLAN, (III)
APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION
THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO,
AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Cobalt

International Energy, Inc. *et al.* (the "Debtors") hereby objects (the "Objection") to the *Debtors'*

*Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II)*

*Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors'*

*Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection*

*Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief*

[Docket No. 978] (the "DS Motion") and the *Disclosure Statement for the Amended Joint*

*Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* [Docket No. 274]

(the "Amended Disclosure Statement"). In support of the Objection, the Committee respectfully

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

states as follows:

## I.  <u>PRELIMINARY STATEMENT</u>

1.      The Amended Disclosure Statement, and the Amended Plan that it purports to describe, are lacking even the most basic information necessary for creditors to determine whether to accept or reject the Amended Plan.   The documents contain blanks instead of projections of creditor recoveries that render it at best a placeholder until the relevant information can be ascertained (after the scheduled March 6, 2018 auction).  The Debtors' new request to later "supplement" the disclosure statement after solicitation has commenced evidences the Debtors' own tacit acknowledgement that they are incapable of providing the most basic information relevant to creditors being asked to vote on the plan -- *i.e.*, what will their distributions be -- until bids for the Debtors' assets are submitted and an auction is conducted, and thus that the Amended Disclosure Statement does not contain "adequate information."

2.      After filing their initial plan and disclosure statement on January 23, 2018, less than 72 hours before the Disclosure Statement Hearing and the night before the objection deadline, the Debtors filed an Amended Plan and accompanying Amended Disclosure Statement that fails to remedy the inadequacies of the original disclosure statement.  Rather, they confirm that neither the initial nor the Amended Disclosure Statement contain adequate information, insofar as the Debtors now propose to unilaterally and without Court approval "supplement" the Amended Disclosure Statement as soon as practicable after the auction to provide, for the first time, a recovery analysis for creditors being asked to vote on the Amended Plan.

3.      The Debtors' approach is fundamentally violative of the Bankruptcy Code and Bankruptcy Rules which require that creditors have 28 days to object to a disclosure statement absent an order shortening time for cause.  In addition, by proposing to provide creditors with a recovery analysis as soon as practicable after the March 6th auction, but fixing

the voting deadline at March 26, 2018, the Debtors have effectively shortened the time that creditors armed with the facts will have to vote.

        4.      The manner in which the Debtors propose to proceed is offensive to any notion of due process or fair compliance with the Bankruptcy Code or federal and local rules. Moreover, their approach will compound the expense, as they propose to send two mailings to the creditor body, and create chaos and confusion as in the first instance creditors will be sent a ballot to vote on a plan and, for the first half of the voting period, will be deprived of the necessary information upon which to cast their vote.   Such blatant disregard of the fundamental procedural requirements will unfairly prejudice and disenfranchise creditors and accordingly should not be condoned.

        5.      There is more meaningful information missing from the Amended Disclosure Statement than is included:

- The Amended Disclosure Statement contains a chart summarizing classes of claims and interests that is completely  blank for both the estimated allowed amount of general unsecured claims and estimated recovery with respect to each and every class of claims and interests, including general unsecured claims; the Debtors now propose to "supplement" the already Amended Disclosure Statement with this critical information over two weeks after the approval of the Amended Disclosure Statement.

- All key exhibits are missing, including the Liquidation Analysis.

- The Amended Disclosure Statement has no breakdown of assets and liabilities of the separate Debtors that would allow for any understanding by creditors of the relative solvency or insolvency of each entity or the amounts of distributions projected to be made to creditors as a result.

- The Amended Disclosure Statement provides no description of each of the Debtor entities, their purpose, the corporate structure, intercompany claims and how the Debtors propose to transfer funds by and among the entities to fund obligations under the Amended Plan.

- There is no disclosure as to the relationship between the Debtor entities and why there should not be substantive consolidation of certain Debtors for plan purposes.

- There is <u>no discussion in the Amended Disclosure Statement concerning the potentially valuable unencumbered estate claims that are to be released</u>, the value of those claims and the consideration provided for the releases.

6.       The first question any holder of a general unsecured claim would be expected to ask before voting on the Plan is "how much are the Debtors proposing to pay on my claim?"  Yet, the Amended Disclosure Statement, as filed, admittedly fails to provide any estimate of potential financial recoveries to the holders of such claims.  Without an answer to that question, and many others, informed voting by holders of general unsecured claims is not possible.

7.       Also deficient is the Debtors' description of the pending claims against insiders in the Derivative Actions (discussed below) and the identity of any consideration being provided to the estates in exchange for such release.  Instead, the Debtors now advise they intend to present evidence at the confirmation hearing – <u>after</u> the deadline for submitting ballots in which they are to vote to accept or reject the plan and to opt out of the plan release – thus denying creditors essential information until after it is too late.

8.       Furthermore, the Amended Plan is defective because, among other things, it is not feasible, fails the "best interests of creditors" test, and unfairly discriminates against certain classes of unsecured creditors.

9.       Based on the foregoing and as set forth more fully below, the Court should deny approval of the Amended Disclosure Statement and direct the Debtors to notice a new disclosure statement hearing only after the actual document they are seeking to have approved is on file.

## II. **BACKGROUND**

**A.** **General**

10.     On December 14, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

11.     On December 21, 2017, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of the following three members: (a) Wells Fargo Bank, National Association; (b) Baker Hughes, a GE Company; and (c) Schlumberger Technology Corporation.

12.     The Plan proposes to grant direct and third party releases for no apparent consideration to past and present officers and directors, including those named as defendants in a pending securities litigation, the background for which is briefly summarized below.

13.     Debtor Cobalt International Energy, Inc. ("Cobalt" or "CIE") was formed as a privately-held exploration and production company in 2005.  It conducted an IPO of its shares in 2009, as well as a public stock offering in February 2012 and a public bond offering in December of 2012.

14.     In 2007, Cobalt entered into an agreement with Sonangol E.P. ("Sonangol") to acquire a 40% interest in certain assets in offshore Angola.  In 2009, the Angolan Parliament issued two decrees assigning an interest in certain "Blocks" to Nazaki Oil & Gaz ("Nazaki"), Sonangol P&P, and Alper, Oil, Limitada ("Alper").  In March of 2011, Cobalt learned that the Securities and Exchange Commission (the "SEC") was conducting an informal inquiry into allegations that there was a connection between Nazaki and senior government

5

officials in Angola.  Thereafter, both the SEC and the Department of Justice commenced formal investigations into whether Cobalt had violated the Foreign Corrupt Practices Act of 1977 ("FCPA").

15.     Cobalt drilled two exploration wells in the Angolan drilling region.  It had no rights to gas discoveries, only oil, and the Blocks were ultimately found to contain a substantially higher percentage of gas, and far less oil, than originally estimated.

**B.     Securities Class Action and Derivative Actions**

16.     Certain of the Debtors' current and former Officers[2] and Directors[3] as well as controlling equity[4] are defendants in several pre-petition actions as described below.

**1.     The Securities Class Action**

17.     In November of 2014, the first in a series of lawsuits, a securities class action (the "Securities Class Action"), was filed against Cobalt and its officers, directors, controlling equity, and underwriters, asserting claims in connection with Cobalt's assets and activities in Angola on behalf of purchasers of Cobalt securities.  Other class actions soon followed and the cases were consolidated.

18.     The Securities Class Action is currently pending as *In re Cobalt International Energy, Inc. Securities Litigation*, Civil Action No. H-14-3428 (S.D. Tex.) before District Judge Nancy Atlas.  On May 1, 2015 the plaintiffs in the Securities Class Action filed their amended complaint (the "Class Action Complaint").   The Class Action Complaint alleges that both during and after the class period, Cobalt denied (i) allegations that its partners, Nazaki

---

[2]     The Officers are, collectively, Joseph H. Bryant ("Bryant"), James W. Farnsworth, and John P. Wilkirson.
[3]     The Directors are, collectively, Peter R. Coneway, Henry Cornell, Michael G. France, Jack E. Golden, Kathryn Bailey Hutchinson ("Hutchinson"), N. John Lancaster, Scott L. Lebovitz, Jon A. Marshall, Kenneth W. Moore, J. Hardy Murchison,  Kenneth A. Pontarelli, Myles W. Scoggins, D. Jeff Van Steenbergen, William P. Utt ("Utt"), Van P. Whitfield, and Martin H. Young, Jr..

and Alper, were secretly owned by Manuel Vicente, the head of Sonangol, along with two other senior Angolan government officials, General Kopelipa and General Dino, and (ii) later reports that these three top Angolan governmental officials were the true owners of Nazaki and Alper. The Complaint also alleges that Cobalt had used sham partners in Angola and that Cobalt might have violated the FCPA.  The Class Action Complaint also alleges that throughout the Class Period, Cobalt continued to make repeated representations assuring investors that it had conducted extensive due diligence and investigation into its Angolan partners and that Cobalt's activities in Angola complied with all laws, including the FCPA.

19.     The Class Action Complaint also alleges that Cobalt misrepresented the oil content of its Angolan wells, greatly overstating the potential of those wells, and that unknown to Cobalt's investors, Sonangol insisted that Cobalt withhold facts about the quality of its Angolan oil wells.  According to the class action plaintiffs, by concealing material facts, Cobalt was able to raise over $6 billion through numerous offerings of Cobalt common stock and debt, Cobalt's insiders were able to collect millions of dollars in insider stock sales, and its private equity backers made billions of dollars more.  The Complaint alleges that these revelations collectively caused Cobalt's stock to plummet, wiping out over $3.2 billion in market capitalization.  Significantly, the allegations in the Class Action Complaint survived a motion to dismiss for failure to state a claim and, over heavy opposition, a class has been certified.

20.     In June 2015, the Control Parties [D.I. 82] and CIE, the Officers, and the Directors [D.I. 83] filed Motions to Dismiss the Securities Class Action.  In their motion to

---

4       The controlling equity (the "Control Parties") are, collectively, Goldman, Sachs & Co., Riverstone Holdings LLC, The Carlyle Group L.P., First Reserve Corporation,  and  KERN Partners Ltd., and subsidiaries and affiliates thereof.

dismiss, CIE, the Officers, and the Directors all disputed the allegations underlying the Class Action Complaint.  On January 19, 2016, Judge Atlas denied both Motions to Dismiss [D.I. 108].

21.      On June 15, 2017, Judge Atlas certified the class of plaintiffs in the Securities Class Action, over the objection of CIE, the Officers, the Directors, and the Control Parties [D.I. 244].[5]

2.      **The Derivative Actions**

22.      The same facts and circumstances form the basis of allegations made against past and present officers and directors of Cobalt in three derivative actions pending in District Court of Harris County, Texas that were stayed by the bankruptcy filing.

23.      On May 6, 2016, Ira Gaines, as trustee for the Paradise Wire and Cable Defined Benefit Pension Plan dated 11/11/84, commenced a shareholder derivative action (the "Gaines Action") against certain past and present officers and directors and controlling shareholders in the District Court of Harris County, Texas.   The Gaines Action, styled as *Gaines v. Bryant et al.*, Cause No. 2016-29850, alleges, inter alia, breaches of fiduciary duty and unjust enrichment against the Officers, Directors, and Control Parties.  Baker Botts represents the Officers (except Bryant), Directors, and CIE as a nominal defendant in the Gaines Action.

24.      On November 29, 2016, Karen McDonaugh commenced a shareholder derivative action (the "McDonaugh Action") against certain past and present officers and directors in the District Court of Harris County, Texas.   The McDonaugh Action, styled as

---

[5]      On the Petition Date, the Debtors filed an adversary proceeding against the lead plaintiffs in the Securities Class Action, captioned Cobalt International Energy, Inc. v. GAMCO Global Gold, Natural Resources & Income Trust et al, Case No. 17-03457 (the "Adversary Proceeding").  In the Adversary Proceeding, the Debtors sought to stay the Securities Class Action in its entirety while these bankruptcy cases were pending. The Committee supported this relief, and filed a joinder [Adv. Dkt. No. 55], noting that the Committee sought to protect the Debtors' management from distractions during the pendency of these bankruptcy cases.  Upon agreement of all parties, the automatic stay was extended to all defendants in the Securities Class Action through 12:01 am on April 21, 2018.  No such relief was sought with respect to the Derivative Actions, which constitute property of the estates under section 541 of the Bankruptcy Code and accordingly are stayed.

*McDonough v. Bryant et al.*, Cause No. 2016-82186, alleges, *inter alia*, breaches of fiduciary duty, unjust enrichment, abuse of control, and misappropriation of information against the Officers and Directors. Baker Botts represents the Officers (except Bryant), Directors, and Cobalt as a nominal defendant in the McDonaugh Action.[6]

25.     On April 5, 2017, Dr. Michael Hafkey commenced a shareholder derivative action (the "Hafkey Action," and, together with the Gaines Action and the McDonough Action, the "Derivative Actions") against certain past and present officers and directors in the District Court of Harris County, Texas.  The Hafkey Action, styled as *Hafkey v. Bryant et al.*, Cause No. 2017-23329, alleges, inter alia, breaches of fiduciary duty, corporate waste, and unjust enrichment against the Officers and Directors.  Baker Botts represents the Officers (except Bryant), Directors, and CIE as a nominal defendant in the Hafkey Action.

**C.     The Debtors' Investigation of the Derivative Actions**

26.     Prior to commencing the Gaines Action, Ira Gaines made a demand upon CIE, which demand was refused.  Notably, however, Gaines' demand was first considered by a "Special Litigation Committee" consisting of two members -- Hutchinson and Utt,  the latter of whom was already a defendant in the Securities Class Action and was therefore utterly conflicted and could not exercise independent judgment, and subsequently referred to the full board (which itself was conflicted).  *See, e.g.*, *Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) ("A director will be considered unable to act objectively with respect to a pre-suit demand if he or she is interested in the outcome of the litigation or is otherwise not independent.").  Similarly, Karen McDonaugh's demand on CIE prior to commencing the McDonough Action was rejected by the very same "Special Litigation

---

[6]     Under the *Order Authorizing the Retention and Employment of Baker Botts LLP as Special Litigation Counsel*

Committee," which, as previously noted, was not independent because one of its members was at that point a defendant in two actions.  And, finally, that same "Special Litigation Committee" refused Dr. Hafkey's demand letter and, by that point, Utt was a defendant in three actions and Hutchinson a defendant in one.

## D. The Committee's Investigation of the Derivative Actions

27.     Since its formation, one of the most pressing tasks of the Committee has been the investigation of the Derivative Actions.  In connection therewith, the Committee has issued both formal and informal discovery requests and the Debtors have produced documents. Based on the Committee's investigation thus far, the Committee believes that the Derivative Actions assert colorable claims against certain of the parties whom the Debtors propose to provide direct and third party releases under the Plan.

28.     By letter dated February 7, 2018, the Committee issued a formal demand to the Debtors (the "Demand Letter"), requesting, in light of their conflict of interest, that the Debtors consent to the Committee's prosecution of the Derivative Actions.  In the Demand Letter, the Committee requested that the Debtors respond to its demand by February 12, 2018. On February 19, 2018, the Debtors provided a written response to the Demand Letter indicating that the unidentified "independent and disinterested directors" voted on February 16, 2018 to reject the Committee's demand for derivative standing.

29.     Based on the Amended Disclosure Statement, it appears that the Debtors remain intent on granting the blanket releases under the Plan, and yet the Amended Disclosure Statement, despite offering additional description of the history of the litigations, fails to explain what, if any, consideration is being received in exchange for the releases nor the basis for

---

[Dkt. No. 366], Baker Botts is no longer authorized to represent the Debtors in the Derivative Actions and, as a

concluding that the Derivative Claims are meritless and worthy of abandonment in the manner proposed.

**E.**     **The Proposed Plan and Disclosure Statement**

30.     On January 23, 2018, the Debtors filed their *Joint Chapter 11 Plan of Cobalt International Energy, Inc. and its Debtor Affiliates* [Docket No. 273] (the "Original Plan") and *Disclosure Statement for the Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* [Docket No. 274] (the "Original Disclosure Statement").

31.     On February 19, 2018, the Debtors filed their *Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and its Debtor Affiliates* [Docket No. 429] (the "Amended Plan") and accompanying Amended Disclosure Statement.  The Amended Disclosure Statement only highlights the inadequacies therein and further diminishes the ability of creditors to make an informed vote on the Plan.

32.     The hearing to consider approval of the Amended Disclosure Statement is scheduled on February 22, 2018 at 9:00 a.m. (the "Disclosure Statement Hearing") pursuant to the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling an Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines With Respect to the Debtors' Disclosure Statement and Plan Confirmation, and (V) Granting Related Relief* [Dkt. No. 299] (the "Bid Procedures Order").[7] The deadline to submit bids to purchase certain or all of the Debtors' assets is at 5:00 p.m. on the date of the Disclosure Statement Hearing. *See* Bid Procedures Order at ¶4.

---

result, the Debtors have no counsel in the Derivative Actions.

[7]     The Bid Procedures Order provides that the approval of the Debtors' "Confirmation Schedule" thereunder shall not prejudice any parties' rights to object to, among other things, the adequacy of the Disclosure Statement. *See* Bid Procedures Order at ¶13.

33.     In the Amended Disclosure Statement, the Debtors propose to file a supplement to the Amended Disclosure Statement "on or before March [9], 2018, or as soon after the conclusion of the auction as reasonably practicable, that provides an estimate of the projected recoveries to all holders of claims and interests under the Plan," as well as their liqidation analysis and "[a]ny other information that the Debtors deem material to creditor recoveries or confirmation of the Plan." Amended Disclosure Statement, at 5 and Exhibit B. Apparently the Debtors do not contemplate any vetting by parties in interest or a hearing before the Court with respect to the accuracy and adequacy of the information the Debtors deem worthy of including in the contemplated supplement.

## 1.     Releases

34.     The Amended Plan contains both direct and third-party blanket releases of all claims and causes of action of whatever kind against the Officers, Directors, and Control Parties for no apparent consideration.  *See* Amended Plan, at Article VIII.

35.     In the Amended Disclosure Statement's discussion of the release provisions, the Debtors provide no factual detail to support the direct and third party releases, but merely set forth boilerplate recitations that confirmation of the Plan "shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases . . . and further, shall constitute its finding that each release . . . is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) is in the best interests of the Debtors and all holders of Interests and Claims, [and] (3) fair, equitable, and reasonable . . ."  Amended Disclosure Statement, at 15-16.

36.     The Amended Disclosure Statement provides no evidentiary support that the proposed direct and third party releases constitute an exchange of bargained-for consideration between the Debtors and the Released Parties and virtually no explanation of what is being

compromised and settled.  Thus, it appears that the estates' claims in the pending Derivative

Actions are being surrendered for no consideration.  The Debtors' only attempt to justify the

releases appears in the "Q and A" of the Amended Disclosure Statement where the question is

posed "*Will there be releases and exculpation granted to parties in interest as part of the Plan*?"

In response, the Debtors offer that the Plan does contain releases and assert in conclusory fashion

that they are "necessary and appropriate" and that "[a]ll of the Released Parties … have made

substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate

and implement the Plan, which will maximize the value of the Debtors for the benefit of all

parties in interest."  Amended Disclosure Statement, at 9.

37.     The Amended Disclosure Statement provides no factual support for any of

these conclusory statements.  There is simply no explanation, for example, of what contribution

to the restructuring efforts could have been provided as consideration by the many former

Directors and Officers named in the Derivative Actions, or for that matter how, if at all, the

Amended Plan, which contemplates the orderly liquidation of the Debtors' assets, would be

impacted if the gratuitous releases were removed and the claims transferred to a creditor trust.

38.     Curiously, the Debtors do not specifically identify the "independent and

disinterested" directors who conducted the investigation of the claims asserted in the Derivative

Actions.  The Debtors, as named defendants in the Securities Class Action and the Derivative

Actions, having taken a position in the pending litigation that the facts and circumstances set

forth in the various complaints are not actionable, are hopelessly conflicted and cannot conduct

an independent investigation even if the matter is delegated to a pristine "independent director,"

as that director is bound to a duty of loyalty to the Debtors which are on record as contending

that no claims lie from the complained of conduct.  The Debtors' obvious conflict casts doubt on

whether the outcome of any investigation they have conducted (whether pre- or post-petition)

justifies the release of claims asserted in the Derivative Actions.

      2.      **Treatment of Claims and Interests**

      39.      The Amended Plan is a liquidating plan that provides for the sale of the

Debtors' assets, the distribution of the proceeds thereof and the wind down of the estates.

General unsecured creditors are classified in two classes:  Class 5 (Subsidiary General

Unsecured Creditors) and Class 6 (Cobalt General Unsecured Creditors).  Intercompany Claims

will be reinstated or cancelled, at the Debtors' sole option, and will receive no distribution.

Intercompany Interests receive the same treatment.

### III. DISCLOSURE OBJECTIONS

**A.**      **The Amended Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information as Required by Section 1125 of the Bankruptcy Code**

      40.      The Amended Disclosure Statement fails to satisfy section 1125 of the

Bankruptcy Code in numerous material respects.  Section 1125(b) of the Bankruptcy Code

requires that a proponent of a plan and disclosure statement demonstrate that the disclosure

statement includes "adequate information" for creditors and other parties in interest to make an

informed judgment about the plan.  The obligation to provide adequate information is pivotal.

*See Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex.

1993) (disclosure is the "pivotal" concept in chapter 11 cases).  In determining whether a plan

proponent has provided "adequate information" to creditors and parties in interest, the standard is

not whether the failure to disclose information would harm creditors but whether "hypothetical

reasonable investors receive such information as will enable them to evaluate for themselves

what impact the information might have on their claims and on the outcome of the case, and to

decide for themselves what course of action to take."  *In re Applegate Prop., Ltd.*, 133 B.R. 827,

831 (Bankr. W.D. Tex. 1991).  Significantly, even if more thorough disclosure would not have affected an objecting creditor's vote, that creditor still has standing to object because inadequate disclosure may have induced other creditors to approve the plan.  *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1217 (9th Cir. 1994).  For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent to bear upon the success or failure of the proposals contained in the plan."  *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986; *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution.").

42. Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claims or interest holders with the ability to vote.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)); *see also* 11 Collier on Bankruptcy, 1125.03[1] (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class").

42. Here, as set forth below, the Amended Disclosure Statement omits basic information about matters of primary concern to creditors.  Absent such disclosures, creditors simply have not been provided with "adequate information" to make an informed decision as to whether to accept or reject the Amended Plan.  The Debtors' intention to file a supplement after the auction is conducted identifying, for the first time, the amount of creditor distributions constitutes an admission that the Amended Disclosure Statement in its current form does not contain adequate information.

B.      **The Amended Disclosure Statement Contains Inadequate Information Regarding the Treatment of Claims and Impacts on Creditor Recoveries**

         43.      The Amended Plan does not propose to substantively consolidate the Debtors' assets and liabilities.  As set forth above, general unsecured claims are relegated to two separate classes.

         44.      The Amended Disclosure Statement provides no information with respect to what general unsecured creditors will receive, and the simple reason it does not is because it cannot.  Recoveries under this Plan are based on proceeds of a sale.  Bids for such sale are not due until several hours *after* the Disclosure Statement Hearing.  An auction, if necessary, is not scheduled until March 6, 2018, two weeks after the Disclosure Statement Hearing.  Thus, based on the Debtors' self-imposed plan confirmation schedule, it is impossible for them even to estimate a range of recoveries for creditors.

         45.      The Debtors admit this finally in the Amended Disclosure Statement, which provides that a "supplement" (the "Disclosure Statement Supplement") will be prepared solely by the Debtors, without input from any of the major constituencies or Court approval, and filed and served on March 9, 2018 "or as soon after the conclusion of the auction as reasonably practicable," as determined by the Debtors in their sole discretion.  The Disclosure Statement Supplement will contain:

- a description of bids received and/or successful bids following the auction;

- a chart estimating creditor recoveries by class;

- the Liquidation Analysis; and

- any information "that the Debtors deem material" to creditor recoveries or confirmation of the Plan.

Amended Disclosure Statement, at Exhibit B.  In other words, the Amended Disclosure Statement Supplement will provide the most significant information that creditors seek -- what

they can expect to receive under the Plan – and none of what the Debtors say will be subject to prior notice or opportunity to object or Court approval.

46.     The transmission of a Disclosure Statement missing crtical information followed weeks later by a Disclosure Statement Supplement is a substantively and procedurally improper method to provide adequate information to enable creditors to vote on the Plan for the following reasons, and should be rejected by the Court.

47.     First, the Debtors' unilateral drafting and transmission of a Disclosure Statement Supplement 17 days *after* the Disclosure Statement Hearing deprives creditors and the Court from determining whether such supplement contains adequate information under section 1125 of the Bankruptcy Code and renders the disclosure statement process meaningless. Bankruptcy Rule 2002 provides that parties must be given 28 days' notice of the time to object to a disclosure statement.  The relatively lengthier period underscores the nature of the disclosure statement process, which is intended to provide sufficient time for parties in interest and the Court to vet a disclosure statement in advance of its transmission to creditors to determine whether it contains adequate information to justify mailing it out to creditors to vote on a plan. The Debtors simply ignore this rule and time-honored process and try to invent a process of their own making that is highly prejudicial to voting creditors.  They fail to provide parties the opportunity to weigh in on or object to the information to be contained in the Disclosure Statement Supplement either prior to or after its filing or service, and altogether bypass Court approval of such supplement.  The Debtors essentially are asking the Court to pre-approve a document under section 1125 of the Bankruptcy Code.  Such a blatant disregard for procedural and substantive due process is unfair, would set a terrible precedent and should not be countenanced.

48.     Second, the filing and service of a Disclosure Statement Supplement seriously curtails the period during which creditors are permitted to vote on the Amended Plan with the benefit of the relevant information.  The proposed voting deadline is March 26, 2018. The proposed solicitation date is February 26, 2018.  Thus, if an adequate disclosure statement were solicited on February 26th, creditors would have a 30-day voting period.  Here, by the Debtors' own admission, the Amended Disclosure Statement will not contain adequate information under section 1125 of the Bankruptcy Code until the filing of the Disclosure Statement Supplement on March 9, 2018, thus providing creditors only a 17-day voting period or less (excluding the time for mailing such supplement which will further reduce that 17-day period).

49.     Third, the Debtors' approach adds unnecessary confusion to the voting process.  Creditors will receive an approved a ballot and Amended Disclosure Statement that is missing a critical document– the Disclosure Statement Supplement – which they will then receive weeks later.  What if a creditor submits a ballot between February 26, 2018 and March 9, 2018? Will the Debtors tabulate such ballots, notwithstanding the fact that they could not possibly have been submitted based on adequate information?  Will creditors who do so be entitled to change their votes and will they be informed that they have a right to do so?   The approach raises a litany of problems stemming from the Debtors' attempt to skirt the solicitation rules.

50.     Furthermore, as set forth above, the Plan proposes that intercompany claims and interests will be canceled or reinstated at the Debtors' discretion.  The Amended Disclosure Statement does not contain sufficient information as to the relationship between the Debtor entities, the description of intercompany claims and interests, or the impact of reinstatement or cancellation of intercompany claims on general unsecured creditor recoveries.

The Debtors must disclose the foregoing information so that general unsecured creditors are adequately informed with respect to what they are going to receive under the Plan.

51.     Lastly, the Amended Disclosure Statement and Amended Plan contain inconsistencies with respect to the treatment of the first and second lien note claims.   The description of the proposed treatment of the first and second lien note claims is stated one way in the Plan and another way in the Disclosure Statement creating, at the very least, a confusing picture of the Debtors' planned treatment of these claims.

**C.     The Description of the Basis, if any, for the Proposed Releases Is Inadequate**

52.     The Committee opposes the direct and third party releases proposed in the Amended Plan and reserves its rights to object to them at confirmation.  Putting aside whether such releases render the Amended Plan unconfirmable, which they do, at this stage creditors cannot cast an informed vote on the Amended Plan (and determine whether to opt out of the releases if an opt-out provision is included (as it should be) in the Plan) based on the current disclosures regarding such direct and third party releases.  Creditors need to understand the nature and amount of the claims arising from the Derivative Actions to be released, the identities of the purportedly independent and disinterested board members who conducted the investigation given the Debtors' conflicts described above, the scope of insurance coverage for such claims, who would prosecute such claims if not released by the Debtors, how such prosecution would be funded, which creditors would be beneficiaries of the recovery on account of such claims, and how a hypothetical recovery on account of those claims would impact the distributions to creditors and the liquidation analysis.  Moreover, the Amended Disclosure Statement fails to identify what consideration is being provided in exchange for the releases, except some ephemeral notion that current officers and directors are contributing to the plan process.  There is no discussion of any consideration being provided by former officers and

19

directors, including those named as defendants in the Securities Class Action and the Derivative Actions.  Absent such information, the Amended Disclosure Statement should not be approved.

53.     None of the Fifth Circuit's requirements for approval of direct and third party releases are satisfied by the information provided in the Disclosure Statement.   The Fifth Circuit forbids non-consensual, non-debtor releases.  *See*, *e.g.*, *In re Patriot Place, Ltd.*, 486 B.R. 773, 822-23 (citing *In re Vitro SAB de CV*, 701 F.3d 1031 (5th Cir. 2012); *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995).  Moreover, the Fifth Circuit has expressly declined to follow other circuits that have taken a more lenient view toward non-debtor releases under certain "extraordinary circumstances."  *See Patriot Place*, 486 B.R. at 822-23.

54.     In addition, while section 1123(b)(3)(A) permits a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate," including a release of estate claims against non-debtors, any such release must satisfy the requirement of a valid settlement of claims under the Bankruptcy Code.  *See In re Bigler LP*, 442 B. R. 537, 543 (Bankr. S.D. Tex. 2010). Specifically, "[i]t would require, inter alia, consent and consideration by each participant in the agreement to be valid."  *Id.* at 543-44.  In *Bigler*, the court approved a release of estate claims against non-debtors where the release was part of the consideration given to a non-debtor (Amegy Bank), which was providing all of the funding to effectuate the terms of the plan – including payments to unsecured creditors.  *See id.* at 544. Thus, the court concluded, it was a settlement of claims "for consideration, pursuant to arms-length negotiations" in satisfaction of section 1123(b)(3)(A).  *Id.*

55.     There is no disclosure whatsoever regarding the consideration provided in exchange for the releases or any arms-length negotiations with respect thereto.  As set forth above, the Amended Disclosure Statement contains only the boilerplate language that the direct

20

and third party releases are provided "in exchange for the good and valuable consideration provided by the Released Parties" and that "all of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan . . . ."[8]  At this point in the process, the Debtors must know what consideration these parties are providing and what contributions they have made towards the formulation of the Original Plan and Amended Plan that are on file.  While the propriety of the releases is a confirmation issue, to the extent that the Debtors know the factual information purportedly justifying such releases, they must include it in the Amended Disclosure Statement. The Debtors must also disclose the impact on creditor recoveries of the release of estate claims against non-debtors and, in the alternative, the pursuit of such claims if the releases are not approved at confirmation.

56.     In addition, the Fifth Circuit has a "specificity test" with respect to approval of releases.  *See Hernandez v. Larry Miller Roofing, Inc.*, 2016 U.S. App. LEXIS 204, at *15 (5th Cir. Jan. 5, 2016 ) (holding that release provisions in plan not specific enough to release a third party claim against a non-debtor).  For example, a party's status as an officer or director combined with boilerplate release language is not sufficiently specific.  *See id.* (citing *In re Applewood*, 203 F.3d 914 (5th Cir. 2000)).  Based on the foregoing, creditors are entitled to adequate disclosure with respect to the identities of the released parties and the claims proposed to be released.

57.     The proposed release of claims against non-debtors proposed by the Original Plan was non-consensual.  In the Amended Plan, the Debtors now propose to provide an insufficient opt-out election with respect to the third party releases in an attempt to render such

---

[8]     It is difficult to imagine what contributions to the Debtors' restructuring could have been made by the Debtors'

releases "consensual" in satisfaction of Fifth Circuit requirements.  This Court recently approved

the following opt-out provisions that the Committee believes are appropriate here:

- Creditors who vote to reject the Plan are automatically not bound by the third party releases and are not required to check the opt-out box on the ballot;

- Creditors who vote to accept the plan and check the opt-out box are not bound by the third party releases;

- Creditors who submit a ballot that abstains from voting to accept or reject the plan but check the opt-out box are not bound by the third party releases; and

- Creditors who both receive proper notice and fail to submit a ballot altogether are bound by the third party releases.

*See In re EMAS Chiyoda Subsea Ltd.*, Case No. 17-31146 (MI) (Bankr. S.D. Tex. May 25, 2017)

[Docket No. 455-3; Exhibit 3-A (Class 1-G Ballot – General Unsecured Claim Against EMAS-

AMC Pte. Ltd)].   Absent the foregoing terms, the third party releases cannot be consensual.

## IV. SOLICITATION PROCEDURES OBJECTIONS

58.     The Committee objects to certain of the solicitation procedures proposed

in the DS Motion, which improperly disenfranchise creditors.[9]

## A.     The Proposed Voting Record Date Occurs Before the Proposed Bar Date

59.     The Debtors have filed the *Debtors' Motion for Entry of an Order (I)*

*Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section*

*503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date,*

---

*former* officers and directors who are included in the Released Parties.

[9]     The Debtors filed the *Notice of Filing of Revised Proposed Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 434] late last night.  Based on a cursory review, the Committee believes that some, but not all, of its objections to the proposed solicitation procedures have been addressed.  To the extent they have not been, the Committee will continue to discuss with the Debtors and, absent a resolution, request that the Court direct the modifications herein to be made.

*(III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9)*

*Request, and (IV) Approving Notice of Bar Dates* [Docket No. 325], which is also scheduled to

be heard at the Disclosure Statement Hearing.

        60.    The Debtors' proposed bar date/solicitation/confirmation schedule is as

follows:

| | |
|---|---|
| 2/20/18 | Voting Record Date |
| 2/26/18 | Solicitation Mailing |
| 2/27/18 | Bar Date Notice Mailing |
| 3/19/18 | Bar Date |
| 3/23/18 | Plan Supplement |
| 3/26/18 | Voting Deadline/Confirmation Objection Deadline |
| 3/30/18 | Confirmation Hearing |

Based on the foregoing, and unlike in most cases, the Voting Record Date will occur before the

Bar Date.  Since the Voting Record Date determines who will receive ballots and who will be

entitled to vote, certain creditors could impermissibly be deprived of their fundamental right to

vote on the Plan.  The Committee proposes that the Debtors modify the solicitation procedures:

(i) to permit parties to vote who file proofs of claim between the Voting Record Date and the Bar

Date for claims that, as of the Voting Record Date, either are not scheduled claims or are

scheduled as contingent, unliquidated or disputed; (ii) to provide that the Debtors will mail

solicitation packages (including ballots) to such parties one business day after the Bar Date; and

(iii) to extend the Voting Deadline for such parties, if necessary.

**B.**      **Creditors Whose Claims are the Subject of an Objection Should Be Provided With Sufficient Time to Obtain a Resolution Event**

        61.    The DS Motion proposes the following procedures regarding voting rights

with respect to claimants whose claims are the subject of objections:

- if the Debtors file a "reduce and allow" claim objection at any time, the claimant is entitled to vote the claim in the reduced amount absent further order of the court;

- if the Debtors object to a claim on or before March 19, 2018  (other than a "reduce and allow" objection), the claimant will receive a Disputed Notice and is not entitled to vote absent a Resolution Event occurring by March 22, 2018; and

- if Debtors object to a claim after March 19, 2018  (other than a "reduce and allow" objection), claim shall be deemed temporarily allowed for voting purposes without further action by claimant.

DS Motion, Exhibit A (Disclosure Statement Order), Schedule 2 (Form of Solicitation and

Voting Procedures), at ¶3.

62.     A "Resolution Event" means that one of the following occurs by March

22, 2018:

- Court order allowing claim under section 502(b);

- Court order temporarily allowing claim for voting purposes under Bankruptcy Rule 3018;

- executed stipulation resolving claim objection and allowing claim in agreed amount; or

- withdrawal of objection.

*See id.*

63.     There is insufficient time to have a Resolution Event (most of which

involve obtaining a Court order) by March 22, 2018 if a claim objection is filed on March 19,

2018.   The Resolution Event should be the Confirmation Hearing on March 30, 2018, to give

claimants adequate time to seek to have their claims temporarily allowed for voting purposes.

64.     In addition, the Debtors should be required to file all objections to claims

(including a "reduce and allow" objection) that affect claimants' voting rights on or before

March 19, 2018.   If the Debtors object to a claim after March 19, 2018 (including a "reduce and

allow" objection), the claim should be deemed temporarily allowed for voting purposes without

further action by claimant.

**C.**     **The Ballots Should Contain Release Opt-out Election**

65.     Non-consensual, non-debtor releases are *per se* impermissible under Fifth Circuit law.  Accordingly, the Debtors must provide creditors with the right to elect to opt out of the releases on the terms set forth above in paragraph 53.  The ballots should be modified accordingly.

**D.**     **The Solicitation Package Should Include the Committee Solicitation Letter**

66.     Given all of the issues with the Plan addressed above, in the event that the Court is inclined to approve the Disclosure Statement and permit solicitation to proceed, it is entirely appropriate for the Debtors to be required to include a letter from the Committee (the "Committee Letter") as part of the solicitation packages.  *See In re Boomerang Tube, LLC*, Case No. 15-11247 (Bankr. D. Del. 2015), Tr. of Proceedings held August 11, 2015 at 5:17-20 (allowing inclusion of Committee letter by agreement among parties); *In re Motor Coach Indus., Inc.*, Case No. 08-12136 (Bankr. D. Del. 2008), Tr. of Proceedings held Dec. 17, 2008 at 44:7-46:21 (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) (permitting a creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); *In re Federated Dep't Stores, Inc.*, 1992 Bankr. LEXIS 392, at *21 (Bankr. S.D. Ohio Jan. 10, 1992) (solicitation packages included a letter from the appropriate creditors' committee recommending a vote in favor of the plan); *In re JHT Holdings, Inc., et al.*, Case No. 08-11267 (BLS) [Docket No. 302] (disclosure statement included bold, all capital letters recommendation by creditors' committee summarizing concerns and urging creditors to reject the plan).  Attached as **Exhibit A** is the proposed Committee Letter.

## V.  RESERVATION OF RIGHTS

67.    The Committee reserves its right to (i) supplement this Objection at or prior to the hearing on the DS Motion and approval of the Disclosure Statement and (ii) object to the Disclosure Statement Supplement.

## VI. CONCLUSION

Based on the foregoing, the Committee respectfully requests that this Court deny approval of the DS Motion and Disclosure Statement absent the significant changes thereto as set forth in this Objection and grant such other and further relief as this Court deems appropriate.

Dated:   February 21, 2018

>       */s/Kenneth Green*
> SNOW SPENCE GREEN, LLP
> Kenneth Green, Esq. (TX Bar No. 24036677)
> 2929 Allen Parkway, Suite 2800
> Houston, TX 77019
> Telephone: (713) 335-4830
>
> *Local Counsel for the Official Committee of*
> *Unsecured Creditors*
>
> PACHULSKI STANG ZIEHL & JONES LLP
>
> Robert J. Feinstein, Esq. (admitted *pro hac vice*)
> Steven W. Golden, Esq. (TX Bar No. 24099681)
> 780 Third Ave., 34th Fl.
> New York, NY  10017
> Telephone:  (212) 561-7700
>
> Ira Kharasch, Esq. (admitted *pro hac vice*)
> 10100 Santa Monica Boulevard, 13th Floor
> Los Angeles, CA 90067-4100
> Telephone:  (310) 277-6910
>
> *Lead Counsel for the Official Committee of*
> *Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 21, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Kenneth Green*
Kenneth Green
